**Lansing, Michigan**

# Opinion

Chief Justice:      Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra

FILED MAY 14, 2012

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v                                                     No. 142913

VERDELL REESE, III,

Defendant-Appellee.

BEFORE THE ENTIRE BENCH

YOUNG, C.J.

We granted the prosecution's application for leave to appeal to resolve whether Michigan law recognizes the doctrine of "imperfect self-defense" as an independent theory that automatically mitigates criminal liability for a homicide from murder to voluntary manslaughter when a defendant acts as the initial aggressor and then claims that the victim's response necessitated the use of force. We hold that the doctrine of imperfect self-defense does not exist in Michigan law as a freestanding defense

mitigating murder to voluntary manslaughter, although we recognize that factual circumstances that have been characterized as imperfect self-defense may negate the malice element of second-degree murder. When analyzing the elements of manslaughter in light of defendant's self-defense claim, we conclude that the Court of Appeals erred in its ruling on the sufficiency of the prosecution's evidence to sustain defendant's manslaughter conviction. Therefore, we reverse in part the Court of Appeals' judgment,[1] affirm the trial court's verdict of manslaughter, and remand this case to the Court of Appeals for further consideration of defendant's remaining issue on appeal.

## I. FACTS AND PROCEDURAL HISTORY

Defendant, Verdell Reese, III, was charged with second-degree murder[2] and, alternatively, voluntary manslaughter[3] for the April 2008 death of Leonardo Johnson.[4] Defendant waived his right to a jury trial and proceeded to a bench trial in the Wayne Circuit Court.

According to testimony adduced at trial, defendant owed $2,000 to Johnson, who was so upset about the debt that he had not spoken to defendant for approximately six months. Johnson lived with his cousin, James Long, in Detroit. Defendant was Long's

---

[1] The Court of Appeals affirmed defendant's convictions for being a felon in possession of a firearm, MCL 750.224f, and felony-firearm, MCL 750.227b. Because defendant does not cross-appeal those convictions in this Court, our opinion today does not disturb them.

[2] MCL 750.317.

[3] MCL 750.321.

[4] In addition to these charges, defendant was also charged with being a felon in possession of a firearm, carrying a concealed weapon, and felony-firearm.

2

close friend; Long described his relationship with defendant as being "like brothers." Other testimony established that defendant visited the residence that Long and Johnson shared several times a week, even though Johnson did not like that defendant visited with such frequency.

Long testified that on the evening of April 17-18, 2008, defendant and a man named John Smith (also known as J.T.) arrived at the Johnson/Long residence. After they had been at the house for a couple of hours, defendant and another friend, D, drove to a nearby store to purchase liquor. While defendant and D were at the store, Lakeshia Williams, who was Johnson and Long's cousin, left the house with Smith and walked toward the east, where she lived.

Williams testified that, after she left the house, she saw Johnson approach from the east. Once Smith greeted Johnson, Williams heard two gunshots as defendant's car drove past them. She heard the first gunshot come from the driver's side of the car, but testified that she did not know the origin of the second gunshot. Smith placed himself between Williams and the street and, after the second gunshot, ran back to Johnson and Long's house. Johnson also continued on his way to his house, while Williams continued to her house and told her father about the gunshots she heard.[5]

Although Williams did not see the ensuing encounter between Johnson and defendant, Long did. After parking his car on the street, defendant walked toward the house and began talking with Long. According to Long, Johnson then approached the

_____

[5] Long also testified that he heard a gunshot from the east and that defendant and D were driving back from the store, also from the east, at about this time.

3

house and asked, "[W]hat's up with that[?]" to which defendant replied, "[W]hat's up with what?" Long testified that he then saw both defendant and Johnson step back and flinch. Long then heard a shot and saw muzzle fire coming from Johnson's direction, followed by five more shots that came from both Johnson's and defendant's positions.

Once the shooting ended, Johnson ran across the street and through a vacant lot, while defendant remained in front of the house. A police officer responding to the shooting found Johnson's body facedown on the driveway of a house one block north of the shootings. Johnson's .40 caliber semi-automatic pistol was nearby and contained a live round that had jammed in the chamber. The medical examiner testified that Johnson had been shot twice and that the fatal bullet passed through his right arm into his chest.

Defendant had been shot in the right leg. Long and Smith drove defendant to the hospital in defendant's car, but not before Long put defendant's gun in the house. Another officer was dispatched to the hospital where defendant was admitted and took a brief statement from defendant.[6] Defendant "was very vague [and] did not want to give any information about what happened." However, defendant did say that "he was standing outside by the car, heard several shots and was struck by several shots" before being taken to the hospital. Defendant claimed to know neither the person who fired the shots nor where the shots had come from. He later changed his version of the events and told another officer that the shots came from a vacant lot across the street, although defendant again said that he could not provide a description of the shooter. In his third statement to police, defendant denied having seen who shot him and did not state the

---

[6] At this point, officers considered defendant a gunshot victim.

4

location of the shooter. However, he claimed that he did not think he was the intended target of the shooting.

At the bench trial, defense counsel did not call any witnesses and argued that defendant did not shoot Johnson or, alternatively, that defendant shot Johnson in self-defense. The trial court made its findings of fact and issued its ruling from the bench. First, the trial court rejected defense counsel's claim that defendant did not shoot and kill Johnson: "There's no question . . . [that] Mr. Johnson shot at Mr. Reese and Mr. Reese shot at Mr. Johnson, okay. So to suggest that Mr. Reese never shot Mr. Johnson is a mischaracterization of what was proffered by way of evidence here." The trial court theorized that the shootings occurred because defendant and Johnson "[couldn't] settle their scores in a diplomatic or a professional or responsible way."

Addressing the defendant's alternative claim of self-defense, the trial court explained that the general rule of self-defense in Michigan is that "one . . . may use deadly force in self-defense if he . . . honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that deadly force is necessary to prevent such a death or great bodily harm." The trial court emphasized that "the touchstone of any claim of self-defense as justified for homicide is a necessity . . . ." Thus, the trial court determined that "whether or not the Defendant himself was the original aggressor . . . [is] key to the evaluation of the self-defense defense."

The trial court then explained that "Michigan courts have recognized the doctrine of imperfect self-defense . . . [as] a qualified defense that mitigates second degree murder to voluntary manslaughter . . . ." The trial court continued, emphasizing that "the doctrine only applies where the Defendant would [have] had the right of self-defense

5

[and] . . . he acted as the initial aggressor." Finally, the trial court explained that an initial aggressor is entitled to the justification of self-defense when "he generally stopped fighting his assault and clearly let the other person know that he wanted to make peace."

The trial court acquitted defendant of second-degree murder, explaining:

> Is this homicide murder in the second degree? It is not. I don't think the People have proven [their] case beyond a reasonable doubt, but what the Court has found is that in this case there's no question that the victim shot at Mr. Reese.

The trial court then concluded that defendant was the initial aggressor in the confrontation:

> The fact of the matter is, is that Mr. Reese was the one that fired the first shot as Mr. Johnson is walking back to his house and I agree with the prosecutor. This is Mr. Johnson's house, not Mr. Reese's house and Mr. Reese knew that if he'd come to that house there would be trouble . . . .
>
> That being stated the evidence shows clearly the Defendant shot out of the car the first shot. That was verified by Miss Williams. She saw that. The Court can use circumstantial evidence and you [defendant] were in the car. This is verified by Mr. Long who says you got out of the car and as you're walking up, so, too, is Mr. Johnson and at that point this is where the evidence parts ways, who fired the first shot.
>
> This is where the imperfect self-defense comes in and that is clearly that you were the aggressor. The Court finds, Mr. Reese, that you were the aggressor in this case; that you fired the first shot prompting Mr. Johnson to be on guard, prompting Mr. Johnson to pull his weapon on you, prompting you then to pull your weapon on him and no question, this was a shoot-out.

After identifying this as a case involving imperfect self-defense, the trial court applied the elements of manslaughter to the evidence in this case:

> The Court finds the prosecution has proven, first, that the Defendant caused the death of Mr. Johnson; that is, that Mr. Johnson died as a result of multiple gunshot wounds.

6

Second, the Defendant had one of these three states of mind; he either intended to kill Mr. Johnson or he intended to do great bodily harm to Mr. Johnson and pumping five rounds into somebody is pretty much evidence that you intended to at least, at the very least, do great bodily harm to Mr. Johnson or knowingly created a very high risk of death or great harm bodily harm knowing that death or such harm would be the likely result of your actions and, third, the Defendant caused the death without legal justification.

The Court find[s] you to be the aggressor here. You're the one [who] shot the first shot. You're the one [who] scared Mr. Johnson into believing that now he had to defend himself. . . .

Mr. Johnson . . . said, ["]what's up with that[?"] The Court infers from that statement that he's wondering, what the heck you doing shooting a gun off by his house, and the Court finds that you shot him . . . .

* * *

The Court finds that the Defendant did not act in lawful self-defense and the People have proven that he did not act in lawful self-defense because he was the initial aggressor.

He didn't back off. He didn't say, okay, it didn't mean anything. Hey, Mr. Johnson[,] . . . I didn't mean anything . . . .

* * *

The Court's going to find the Defendant guilty of voluntary manslaughter, homicide manslaughter for the reasons stated on this record.[7]

The trial court subsequently sentenced defendant, as a third-offense habitual offender, to 8 to 30 years' imprisonment for the manslaughter conviction.[8] Immediately before

---

[7] The court also convicted defendant of being a felon in possession of a firearm and felony-firearm, but acquitted defendant of carrying a concealed weapon.

[8] Defendant received a sentence of 1 to 10 years' imprisonment for the felon-in-possession conviction and the 2-year mandatory consecutive sentence on the felony-firearm conviction, with 217 days of credit on the felony-firearm conviction.

7

sentencing, defense counsel moved for a new trial on the basis of potential testimony by Smith. Defendant renewed this request in a postsentence pro se motion for a new trial on the basis of counsel's failure to call Smith as a witness. The trial court denied both motions in a subsequent written opinion.

On appeal, defendant claimed that the prosecution had failed to prove that he was the initial aggressor and that, therefore, he had a valid self-defense claim. Second, defendant claimed that the trial court had abused its discretion by denying his posttrial motions for a new trial.

The Court of Appeals vacated defendant's conviction for voluntary manslaughter and remanded for a new trial on the basis of defendant's first claim of error.[9] The panel stated that it was "unable to reconcile the uncontroverted facts with what appears to be the trial court's inaccurate application of the doctrine of imperfect self-defense."[10] In particular, the panel questioned the trial court's conclusion that defendant was the initial aggressor:

> The evidence indicates the initial firing of two shots in an unknown direction and by an unknown individual before the face-to-face confrontation between Reese and Johnson. Only the first shot was attributed to Reese based on Williams indicating she heard the shot and assumed it was from his vehicle. Williams could not place whether the shooter was in the driver's seat or back seat of the vehicle. There is no testimony or evidence to identify who fired the second shot or where it originated. Based on Johnson's continued ambulation toward Reese and Long's house and engaging Reese in conversation, albeit very briefly, it

---

[9] *People v Reese*, unpublished opinion per curiam of the Court of Appeals, issued September 16, 2010 (Docket No. 292153), p 1.

[10] *Id.*

seems reasonable to assume that Johnson did not feel threatened or intimidated by this random, preceding gunfire, which requires us to question the trial court's labeling of Reese as the initial aggressor to justify the use of imperfect self-defense to convict him of voluntary manslaughter.[11]

The Court of Appeals criticized the trial court's characterization of defendant's intent to harm Johnson as "problematic on a number of levels."[12] First, the panel claimed that there was a "lack of evidence that Reese personally fired five shots during the events involved" because "[t]he medical examiner identified only two wounds to Johnson."[13]

Second, the panel claimed that the trial court's ruling "would contraindicate the applicability of imperfect self-defense," given the trial court's conclusion that Smith interfered with Williams's ability to see the shots from the car "[be]cause he knows something is coming down . . . ."[14] If this observation could be attributed to defendant's state of mind, the panel reasoned, that "state of mind would preclude the use of imperfect self-defense."[15]

Third, the panel claimed that an "insurmountable" difficulty in the trial court's ruling was that the trial court had "failed to address Reese's intent at the crucial point in time—the initial provocation."[16] The panel then concluded that the evidence did not

---

[11] *Id.* at 3.

[12] *Id.*

[13] *Id.*

[14] *Id.* at 4.

[15] *Id.*

[16] *Id.*

support the assumption that defendant acted with the required intent during the initial provocation because even if defendant fired the initial shots before the deadly confrontation, "there is no evidence that he aimed his weapon at Johnson" and the only evidence regarding defendant's intent was "some cryptic comments between Johnson and Reese before they exchanged fire . . . ."[17]

Finally, the panel criticized the trial court for failing to account for the "delay between the first shots and any further aggression," which the panel speculated was a sufficient length of time for defendant to "withdr[a]w from the conflict" and for Johnson to "initiate a new conflict."[18]

In the end, the Court of Appeals concluded that it could not "state with any confidence that either the factual findings or the conclusions of law by the trial court are sufficient to sustain Reese's conviction for voluntary manslaughter."[19] Accordingly, the panel vacated defendant's manslaughter conviction and remanded this case to the trial court for a new trial, although it affirmed defendant's convictions and sentences for being a felon in possession of a firearm and possessing a firearm during a felony. Because it granted defendant a new trial, the panel did not address defendant's second claim of error, involving defendant's motion for a new trial based on Smith's potential testimony.

This Court granted the prosecution's application for leave to appeal and ordered the parties to address "whether the doctrine of imperfect self-defense can mitigate

---

[17] *Id.*

[18] *Id.* at 4-5.

[19] *Id.* at 5.

second-degree murder to voluntary manslaughter and, if so, whether the doctrine was appropriately applied to the facts of this case by the Wayne Circuit Court."[20]

## II. STANDARD OF REVIEW

Whether the doctrine of imperfect self-defense exists under Michigan law is a question of law, which this Court reviews de novo.[21] In examining the sufficiency of the evidence, "this Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt."[22] A trial court's findings of fact may not be set aside unless they are clearly erroneous.[23] A ruling is clearly erroneous "if the reviewing court is left with a definite and firm conviction that the trial court made a mistake."[24]

## III. ANALYSIS

Because the trial court concluded that the doctrine of imperfect self-defense applied to this case, and because the Court of Appeals reversed the trial court's verdict on the ground that the trial court had misapplied the doctrine to the facts of the case, this case presents this Court with the question whether the doctrine of imperfect self-defense exists under Michigan law. Although the Court of Appeals has adopted and applied the

---

[20] *People v Reese*, 489 Mich 958 (2011).

[21] *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002).

[22] *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006).

[23] MCR 2.613(C); *Robinson*, 475 Mich at 5.

[24] *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).

11

doctrine of imperfect self-defense,[25] this Court has neither adopted it nor defined its scope and applicability.

## A.  MICHIGAN LAW OF HOMICIDE

In analyzing the doctrine of imperfect self-defense to determine whether it can mitigate second-degree murder to voluntary manslaughter, we follow the foundational principles of interpretation that this Court has outlined regarding Michigan's law of homicide:

> Because Michigan's homicide statutes proscribe "murder" without providing a particularized definition of the elements of that offense or its recognized defenses,[16] we are required to look to the common law at the time of codification for guidance.  See Const 1963, art 3, § 7;[17] *People v Couch*, 436 Mich 414, 418-421; 461 NW2d 683 (1990).  Where a statute employs the general terms of the common law to describe an offense, courts will construe the statutory crime by looking to common-law definitions.  See *Couch*, [436 Mich] at 419, quoting *Morissette v United States*, 342 US 246, 263; 72 S Ct 240; 96 L Ed 288 (1952):

> "'[W]here [a legislature] borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.  In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.'"

> The criminal law, as defined at common law and codified by legislation, "should not be tampered with except by legislation," and this rule applies with equal force to common-law terms encompassed in the defenses to

---

[25] See, e.g., *People v Vicuna*, 141 Mich App 486, 493; 367 NW2d 887 (1985); *People v Amos*, 163 Mich App 50, 56-57; 414 NW2d 147 (1987); *People v Butler*, 193 Mich App 63, 67; 483 NW2d 430 (1992).

12

common-law crimes. *In re Lamphere*, 61 Mich 105, 109; 27 NW 882 (1886).[26]

---

[16] The Legislature has bifurcated all murder offenses into first-degree murder, MCL 750.316, and second-degree murder, MCL 750.317. The statutory description of these offenses has changed little since the first Penal Code was enacted in 1846. See *People v Couch*, 436 Mich 414, 418-421; 461 NW2d 683 (1990) (opinion by BOYLE, J.).

[17] "The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed."

---

When the Legislature codifies a common law offense and thereby adopts the common law defenses to that offense, this Court is "proscribed from expanding or contracting the defense as it existed at common law."[27]

*Riddle* correctly observed that Michigan statutory law proscribes, but does not define, "murder."[28] The same can be said of "manslaughter."[29] Because both of these

---

[26] *Riddle*, 467 Mich at 125-126.

[27] *Id.* at 126; see also *People v Dupree*, 486 Mich 693, 706; 788 NW2d 399 (2010) ("Absent some clear indication that the Legislature abrogated or modified the traditional common law affirmative defense of self-defense for the felon-in-possession charge in MCL 750.224f or elsewhere in the Michigan Penal Code, we presume that the affirmative defense of self-defense remains available to defendants if supported by sufficient evidence."). In 2006, the Legislature enacted the Self-Defense Act, MCL 780.971 *et seq*. This Court has not interpreted the act beyond stating that it does not apply to crimes committed before the act's effective date, see *Dupree*, 486 Mich at 708. However, its provisions, and its relation to the common law of self-defense, are not at issue in the instant case because neither party claims that it applies here.

[28] See MCL 750.316 (first-degree murder); MCL 750.317 (second-degree murder). "Although first-degree murder is defined by statute, the statute is understood to include the common-law definition of murder." *People v Mendoza*, 468 Mich 527, 534 n 6; 664 NW2d 685 (2003).

[29] See MCL 750.321.

13

classes of homicides existed at common law, Michigan courts have defined the statutory terms in light of their common law meanings.

For example, as early as 1858, this Court defined "murder" as when "a person of sound memory and discretion unlawfully kills any reasonable creature in being, in the peace of the state, with malice prepense or aforethought, either express or implied" and stated that "[t]his, the common law definition, is still retained in our statute."[30] The malice enshrined in the common law understanding of murder "did not mean deliberate and calculating malice, but only malice existing at any time before the act so as to be its moving cause or concomitant."[31] Applying this traditional understanding of common law murder, this Court established the following elements of second-degree murder: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse."[32]

---

[30] *People v Potter*, 5 Mich 1, 6 (1858). Although he did not cite Coke's Institutes, Chief Justice MARTIN's opinion defined murder nearly identically to the definition of murder that Blackstone attributed to Coke: "'[W]hen a person of sound memory and discretion unlawfully killeth any reasonable creature in being, and under the king's peace, with malice aforethought, either express or implied.'" 4 Blackstone, Commentaries on the Law of England (2d Cooley ed), p *195, quoting 3 Coke, Institutes of the Laws of England, p 47. (This professed quotation of Coke was actually a close paraphrase; Coke defined murder as "when a man of sound memory, and of the age of discretion, unlawfully killeth within any county of the realm any reasonable creature *in rerum natura* under the king's peace, with malice fore-thought, either expressed by the party, or implied by law . . . ." 3 Coke, p 47.)

[31] *Nye v People*, 35 Mich 16, 19 (1876). The *Nye* Court generalized the statutory distinction between first- and second-degree murder in terms of the malice element: "In dividing murder into degrees, its common-law qualities are not changed, but (except in special cases) the division is chiefly between cases where the malice aforethought is deliberate and where it is not." *Id*.

[32] *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998).

The common law distinguished manslaughter from murder by the absence of malice. Blackstone defined manslaughter as "the unlawful killing of another without malice either express or implied" and further classified manslaughter as being committed "either voluntarily, upon a sudden heat; or involuntarily, but in the commission of some unlawful act."[33]

This Court explained the crime of voluntary manslaughter further:

> Manslaughter may in some cases be intentional. In such a case it differs from murder because it is provoked. It is not justifiable to take life under provocation, and yet the provocation may be serious enough to deprive the intentional killing of its malicious character, so that it is neither murder on the one hand nor justifiable or excusable on the other. It is a very serious crime, though not reckoned as done with malice.[34]

In *People v Mendoza*, this Court recently reiterated this common law distinction between murder and manslaughter:

> [T]o show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions. See *People v Pouncey*, 437 Mich 382, 389; 471 NW2d 346 (1991). Significantly, provocation is not an element of voluntary manslaughter. See *People v Moore*, 189 Mich App 315, 320; 472 NW2d 1 (1991). Rather, provocation is the circumstance that negates the presence of malice. [*People v*] *Scott*, [6 Mich 287, 295 (1859)].[35]

Accordingly, *Mendoza* concluded that "the elements of voluntary manslaughter are included in murder, with murder possessing the single additional element of malice."[36]

---

[33] 4 Blackstone, p *191.

[34] *Nye*, 35 Mich at 18-19.

[35] *Mendoza*, 468 Mich at 535-536.

[36] *Id.* at 540.

15

## B. SELF-DEFENSE AND IMPERFECT SELF-DEFENSE

Traditionally, the common law of self-defense justifies an otherwise unlawful homicide by allowing "a man [to] protect himself from an assault, or the like, in the course of a sudden broil or quarrel, by killing him who assaults him."[37] However, Blackstone reiterated that "[t]his right of natural defence does not imply a right of attacking: for, instead of attacking one another for injuries past or impending, men need only have recourse to the proper tribunals of justice."[38]

This understanding of self-defense is consistent with the fact that this Court from a very early time characterized self-defense in terms of necessity: "Human life is not to be lightly disregarded, and the law will not permit it to be destroyed unless upon urgent occasion."[39] This Court's decision in *Riddle* reiterated that "the touchstone of *any* claim of self-defense, as a justification for homicide, is *necessity*."[40] *Riddle* also explained that while there is no duty to retreat from within one's "castle,"[41] or from a sudden, violent

---

[37] 4 Blackstone, p *184.

[38] *Id.*

[39] *Pond v People*, 8 Mich 150, 173 (1860).

[40] *Riddle*, 467 Mich at 127.

[41] *Id.* at 135 ("Where a person is in his 'castle,' there is simply *no safer place* to retreat.").

attack,[42] a "voluntary participant in mutual combat" has the duty to retreat to a safer place before resorting to deadly force.[43]

The Texas Court of Appeals appears to have been the first appellate court to define a separate doctrine of "imperfect self-defense" as it is constituted today, which it did in an 1882 decision.[44] In *Reed v State*, the defendant was convicted of second-degree murder for killing his paramour's husband, apparently while the defendant was *in flagrante delicto* with the victim's wife. The defendant claimed that he acted in self-defense because the husband drew his weapon upon discovering the defendant with his wife. Nevertheless, the trial court concluded that the defendant was not entitled to self-defense in light of the fact that the husband had a justification under Texas law to kill the

---

[42] *Id.* at 129-130 ("[O]ne is never obliged to *retreat* from a sudden, fierce, and violent attack, because under such circumstances a reasonable person would, as a rule, find it necessary to use force against force without retreating. The violent and sudden attack removes the ability to retreat.").

[43] *Id.* at 133.

[44] *Reed v State*, 11 Tex App 509 (1882). The phrase also appears, albeit in a different sense, in Bishop's criminal law treatise, published in 1868:

> There are two kinds of defence which a man may make of his person or his property. The one extends, when necessary to accomplish the object, to the taking of the life of the aggressor; and this we shall call, in the present chapter, perfect defence. The other permits not the person using it to take life; but it does permit him to resist trespasses on his person or property to an extent not involving the life of the trespasser; and this, in the present chapter, we shall call imperfect defence.

2 Bishop, Commentaries on the Criminal Law (3d ed), § 625, p 334. Thus, on Bishop's theory of "imperfect defense," a non-life-threatening "assault and battery, for instance, may be justified as inflicted in defence of one's property." *Id.*, § 642, p 343.

defendant.[45] The appellate court acknowledged that the preservation of one's life was "the first great law of nature" but qualified that right's application: "[T]he right of self-defense, though inalienable, is and should to some extent be subordinated to rules of law . . . ."[46] Accordingly, the court divided self-defense into two separate classes:

> A perfect right of self-defense can only obtain and avail where the party pleading it acted from necessity, and was wholly free from wrong or blame in occasioning or producing the necessity which required his action. If, however, he was in the wrong,—if he was himself violating or in the act of violating the law,—and on account of his own wrong was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself which was superinduced or created by his own wrong, then the law justly limits his right of self-defense, and regulates it according to the magnitude of his own wrong.[47]

Thus, if someone is physically attacked when committing a felony, "and in resisting such attack he slay[s] his assailant, the law would impute the original wrong to the homicide and make it murder."[48] On the other hand, "if the original wrong was or would have been a misdemeanor, then the homicide growing out of or occasioned by it, though in self-defense from an assault made upon him, would be manslaughter under the law."[49] After

---

[45] Texas law at the time considered a homicide justifiable when it was "'committed by the husband upon the person of anyone taken in the act of adultery with the wife, provided the killing take place before the parties to the act of adultery have separated.'" *Reed*, 11 Tex App at 516, quoting article 567 of the Texas Penal Code.

[46] *Reed*, 11 Tex App at 517.

[47] *Id.* at 517-518.

[48] *Id.* at 518-519.

[49] *Id.* at 519.

the Texas court adopted the doctrine of imperfect self-defense, several other states followed suit.[50]

In Michigan, the theory of imperfect self-defense first appeared in a footnote to a 1971 Court of Appeals opinion, although the term itself was not used in that opinion:

> In general, mitigating circumstances are the commission of the killing in a sudden heat of passion caused by adequate legal provocation. 1 Wharton's Criminal Law and Procedure, § 274, p 580 *et seq.*; Perkins on Criminal Law (2d ed), p 54. Wharton and Perkins say that even where such mitigating circumstances are not present the crime may be manslaughter, not murder, when the actor kills in self-defense but was not entitled to do so under the circumstances, either because he was not free from fault or his belief that he was in danger was not justified.[51]

Then Judge LEVIN's obiter dictum[52] remained just that for nine years, until the Court of Appeals' decision in *People v Springer* reversed a second-degree murder conviction on the basis of the defendant's "imperfect right to self-defense."[53] The *Springer* panel

---

[50] *State v Partlow*, 90 Mo 608; 4 SW 14 (1887); *State v Flory*, 40 Wyo 184; 276 P 458 (1929); *Shuck v State*, 29 Md App 33; 349 A2d 378 (1975); *State v Bush*, 307 NC 152; 297 SE2d 563 (1982).

[51] *People v Morrin*, 31 Mich App 301, 311 n 7; 187 NW2d 434 (1971).

[52] *Morrin* involved whether the prosecution had proved the elements of first-degree murder. The panel vacated the defendant's first-degree murder conviction for insufficient evidence to "support a reasonable inference that [the defendant] killed his victim with the requisite deliberation and premeditation" to sustain a first-degree murder conviction. *Id.* at 306. However, the panel concluded that the prosecution had presented sufficient evidence to sustain a second-degree murder conviction and that the jury's verdict "constituted an express finding" of the elements of second-degree murder. *Id.* at 307. Accordingly, the panel ordered entry of a judgment convicting the defendant of second-degree murder. *Id.*

[53] *People v Springer*, 100 Mich App 418, 421; 298 NW2d 750 (1980), remanded on other grounds 411 Mich 867 (1981), rev'd on other grounds 417 Mich 1060 (1983).

explained that this "qualified right of self-defense has been adopted in several jurisdictions" and determined that a defendant "is guilty of manslaughter, not murder" when "the defendant would be entitled to claim self-defense except for the fact that he was at fault in provoking the danger to himself . . . ."[54]

After the Court of Appeals' decision in *Springer*, several other decisions of the Court of Appeals applied the doctrine of imperfect self-defense to situations in which the defendant was the initial aggressor.[55] However, the lead Court of Appeals opinion in *People v Kemp* warned that "the inquiry regarding the applicability of the doctrine of imperfect self-defense requires more than just a determination whether defendant was the initial aggressor."[56] Rather, the court must "focus . . . on '*the intent with which the accused brought on the quarrel or difficulty*'" giving rise to lethal force.[57] On this principle, a defendant who "initiate[s] the confrontation between himself and the victim

---

[54] *Springer*, 100 Mich App at 421.

[55] See, e.g., *Vicuna*, 141 Mich App at 493; *Amos*, 163 Mich App at 56-57; *Butler*, 193 Mich App at 67. The Court of Appeals has also noted that this Court had not recognized the doctrine and chose not to expand the doctrine beyond the scope of *Springer*. Thus, the panel in *People v Deason* stated that "Michigan courts . . . have not addressed [imperfect self-defense] where a defendant merely asserts that he maintained an unreasonable belief or reacted with an unreasonable amount of force" and declined to extend the doctrine in that manner, even though "such circumstances [were] alluded to by Judge, now Justice, LEVIN" in his *Morrin* dictum. *People v Deason*, 148 Mich App 27, 32; 384 NW2d 72 (1985). The panel noted that such an application "would be a significant extension of prior case law and is more appropriately a matter for legislation, court rule, or appeal to the Supreme Court." *Id.*

[56] *People v Kemp*, 202 Mich App 318, 324; 508 NW2d 184 (1993) (opinion by REILLY, J.).

[57] *Id.*, quoting *Partlow*, 90 Mo at 617.

with the intent to kill or do great bodily harm" is not entitled to have the crime be mitigated to manslaughter.[58]

Although Judge CONNOR agreed with the panel's decision to remand for further trial court proceedings regarding voluntary manslaughter, he criticized the lead opinion's emphasis on the doctrine of imperfect self-defense as "counterproductive" in light of the fact that the panel was "only following the longstanding law of voluntary manslaughter in Michigan."[59] Judge CONNOR explained:

> In Michigan, the crime of murder is reduced to manslaughter if committed "under the influence of passion or in the heat of blood produced by adequate provocation." CJI 16:4:02(1). If defendant's desire to kill his victim was actually born of the moment, if it was the result of such provocation that would cause a reasonable person to kill in the heat of passion, then his crime is manslaughter, not murder. See *People v Younger*, 380 Mich 678, 681-682; 158 NW2d 493 (1968).

> I do not believe that the theory of imperfect self-defense adds anything to Michigan's traditional notions of self-defense or voluntary manslaughter, and I would not require the trial court to apply the theory of imperfect self-defense in this case.[60]

Although Judge MICHAEL J. KELLY also concurred in the remand, he too criticized the doctrine of imperfect self-defense, calling it "slippery and undeveloped," and suggested that this Court take up the issue.[61] We do so today.

---

[58] *Kemp*, 202 Mich App at 324.

[59] *Id.* at 327 (CONNOR, J., dissenting in part).

[60] *Id.*

[61] *Id.* at 325 (MICHAEL J. KELLY, J., concurring). Until today, this Court has not resolved the issue, although we have alluded to it in the past. This Court's decision in *People v Heflin*, 434 Mich 482, 509; 456 NW2d 10 (1990) (opinion by RILEY, C.J.), did not formally adopt the doctrine in the context of voluntary manslaughter, but Chief Justice

C.  IMPERFECT SELF-DEFENSE DOES NOT EXIST UNDER MICHIGAN LAW

Under Michigan law, the doctrine of imperfect self-defense does not exist as a freestanding defense that mitigates a murder to manslaughter because it was not recognized as such under the common law at the time the Legislature codified the crimes of murder and manslaughter.

As discussed, the doctrine first appeared in an 1882 Texas decision, postdating the Michigan Legislature's 1846 codification of the common law crimes of murder and manslaughter and their attendant defenses.  It is significant that the doctrine of imperfect self-defense developed *after* the Legislature codified the common law crimes of murder and manslaughter, which means that the Legislature *could not have* codified the doctrine into the murder and manslaughter statutes.  In further support of this conclusion, we note that when adopting the doctrine of imperfect self-defense, the *Springer* panel *acknowledged* that the doctrine was an innovation in the common law by stating that it "*has been adopted* in several jurisdictions . . . ."[62]  Thus, the *Springer* panel erred by

---

RILEY's lead opinion discussed the doctrine's incompatibility with involuntary manslaughter and stated that imperfect self-defense was "an unlawful act that does not fall within the definition of common-law involuntary manslaughter: *a lawful act* negligently performed."  In *People v Posey*, 459 Mich 960 (1999), this Court acknowledged that it had not decided whether Michigan law recognizes the doctrine of imperfect self-defense by stating that "[o]ur resolution of this matter should not be construed as a ruling that 'imperfect self-defense' is recognized as a theory which would reduce murder to manslaughter."

[62] *Springer*, 100 Mich App at 421 (emphasis added).  Other states have similarly refused to adopt the doctrine of imperfect self-defense and noted that the issue is now a matter of legislative prerogative.  See *State v Shaw*, 168 Vt 412, 417; 721 A2d 486 (1998) ("The doctrine of imperfect self-defense has not been generally recognized at common law."); *State v Bowens*, 108 NJ 622, 626-627; 532 A2d 215 (1987) ("[R]ecognition of an

purporting to change the common law of this state *after* the Legislature codified the common law crimes of murder and manslaughter in 1846. This Court has emphatically stated that once the Legislature codifies a common law crime and its attendant common law defenses, the criminal law of this state concerning that crime "should not be tampered with except by legislation . . . ."[63]

Although we reject the doctrine of imperfect self-defense, many circumstances that involve what the Court of Appeals labeled "imperfect self-defense" can nevertheless provide grounds for a fact-finder to conclude that the prosecution has not proved the malice element that distinguishes murder from manslaughter. However, we emphasize that the operative analysis for the fact-finder is not whether the circumstances involving "imperfect self-defense" exist. Rather, the operative analysis is whether the prosecution has proved the element of malice beyond a reasonable doubt. This focus rightly turns on the *actual elements* of murder and manslaughter, rather than any label of "imperfect self-defense" as a judicially created shorthand that risks becoming unmoored from the actual element distinguishing the two crimes.

"[T]he elements of voluntary manslaughter are included in murder, with murder possessing the single additional element of malice."[64] Malice itself "evolved from being

'imperfect self-defense' would require us to create, as a matter of decisional law, new substantive elements not embraced by the [New Jersey] Code [of Criminal Justice].").

[63] *Riddle*, 467 Mich at 126, quoting *Lamphere*, 61 Mich at 109; see also Const 1963, art 3, § 7 ("The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.").

[64] *Mendoza*, 468 Mich at 540.

merely an intent to kill to also evidencing the absence of mitigating circumstances."[65]

After describing several examples of malice, Blackstone explained:

> [The] general rule [is] that all homicide is malicious, and, of course, amounts to murder, unless where *justified* by the command or permission of the law; *excused* on the account of accident or self-preservation; or *alleviated* into manslaughter, by being either the involuntary consequence of some act, not strictly lawful, or (if voluntary), occasioned by some sudden and sufficiently violent provocation.[66]

This understanding of malice is consistent with this Court's 1859 determination that the element of malice is negated when the "direct intent to kill" was caused by "great provocations sufficient to excite the passions beyond the control of reason."[67]

This Court's *Mendoza* decision summarized the scope of the mitigating circumstances that the common law traditionally recognized:

> [B]oth murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. However, the element distinguishing murder from manslaughter—malice—is negated by the presence of provocation and heat of passion.[68]

Additional circumstances—including the label "imperfect self-defense"—were not themselves recognized at common law as negating the element of malice. Because the Legislature chose to codify the common law offenses of murder and manslaughter,

---

[65] *Id.*

[66] 4 Blackstone, p *201.

[67] *People v Scott*, 6 Mich 287, 295 (1859).

[68] *Mendoza*, 468 Mich at 540, citing *Scott*, 6 Mich at 295.

24

thereby including the attendant defenses and mitigations, we are foreclosed from altering that which the Legislature adopted.[69]   Accordingly, we reiterate the *Mendoza* Court's formulation of the distinction between murder and manslaughter and hold that there is no independent defense of imperfect self-defense in Michigan law.[70]

## IV. APPLICATION

Both the trial court and the Court of Appeals analyzed defendant's claim within the context of imperfect self-defense.  The Court of Appeals granted defendant relief in the form of a new trial on the manslaughter charge because it determined that the trial court had both misinterpreted the evidence of this case and misapplied the doctrine of imperfect self-defense to the evidence.  In light of our holding that the doctrine of imperfect self-defense does not exist as an independent mitigation in Michigan law, we need not review the Court of Appeals' analysis of the doctrine except as it relates to the Court of Appeals' application of the facts of this case to the elements of manslaughter.[71]

---

[69] *Riddle*, 467 Mich at 126.

[70] The partial dissent would not rule on the doctrine of imperfect self-defense and instead would leave to another day the question whether the doctrine exists in Michigan law. However, both the trial court and the Court of Appeals treated this case as one involving imperfect self-defense and analyzed the doctrine in detail in their rulings.  As a result, the doctrine of imperfect self-defense is so intertwined with both the trial court's conviction on manslaughter and the Court of Appeals' reversal of that conviction that this Court has the responsibility to obviate the doctrinal confusion regarding imperfect self-defense before analyzing and correcting the other errors in those rulings.  Thus, we are not "reach[ing] out to strike down the doctrine of imperfect self-defense," *post* at 3, but instead are correcting an error of law that already pervades both lower court decisions and that was essential to their rulings.

[71] The trial court concluded that the prosecution had not proved the elements of second-degree murder beyond a reasonable doubt.  Accordingly, the prosecutor conceded at oral argument before this Court that defendant is no longer subject to the second-degree

Voluntary manslaughter requires "a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result."[72]  The trial court concluded that the prosecution had proved the first two elements beyond a reasonable doubt, rejecting defendant's theory that he did not shoot Johnson.  The court based its conclusion on Long's eyewitness testimony that defendant and Johnson engaged in a shooting match in front of Johnson and Long's house.  This conclusion is not clearly erroneous and, along with the unrebutted testimony of the medical examiner, establishes the first two elements of voluntary manslaughter—that defendant caused Johnson's death by gunshot.  The Court of Appeals rightly did not disturb this conclusion.

The trial court also concluded that the prosecution had proved the third element of manslaughter beyond a reasonable doubt—that defendant caused Johnson's death with the requisite intent.  The Court of Appeals, however, rejected as "problematic on a number of levels" the trial court's claim that

> "pumping five rounds into somebody is pretty much evidence that you intended to at least, at the very least, do great bodily harm to Mr. Johnson or knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of your actions."[73]

---

murder charge, and this Court need not speculate whether the evidence adduced at trial could sustain a second-degree murder conviction.

[72] *Mendoza*, 468 Mich at 540.

[73] *Reese*, unpub op at 3.

The panel explained that "there is no evidence that five shots were expended during these events" and that, at most, "only three gunshots can be attributed to Reese, not five as stated by the trial court."[74] Even if the Court of Appeals was correct regarding the number of shots defendant fired, the trial court's reasonable finding that "this was a shoot-out" between Johnson and defendant alone renders its conclusion regarding the intent element of manslaughter not clearly erroneous.[75] Because defendant participated in the shootout, defendant clearly had the intent to create a very high risk of great bodily harm to Johnson, knowing that death or great bodily harm was the probable result of his actions. This intent existed regardless of whether the shooting was justified in self-defense, as defendant claims.[76] Accordingly, the trial court did not clearly err by concluding that the prosecution had proved all three elements of manslaughter beyond a reasonable doubt.

Because defendant claims that he was entitled to assert self-defense as a complete justification for shooting Johnson, we also address this claim. "[O]nce the defendant satisfies the initial burden of production, the prosecution bears the burden of disproving the common law defense of self-defense beyond a reasonable doubt."[77] Defendant has

---

[74] *Id.* at 3-4.

[75] Moreover, a stipulated laboratory report regarding defendant's revolver revealed that it had five empty shell casings in the cylinder, supporting the trial court's factual conclusion that the weapon had been fired five times.

[76] An affirmative defense, like self-defense, "admits the crime but seeks to excuse or justify its commission. It does not negate specific elements of the crime." *Dupree*, 486 Mich at 704 n 11.

[77] *Id.* at 710.

27

satisfied his initial burden of production because he "produc[ed] some evidence from which a [fact-finder] could conclude that the elements necessary to establish a prima facie defense of self-defense exist . . . ."[78] The prosecution claims that defendant was not entitled to assert self-defense, however, because defendant was the initial aggressor in the encounter with Johnson. The trial court agreed with this view.

To analyze the trial court's conclusion that defendant was not entitled to the justification of self-defense, we must examine its conclusion that by firing two shots from his car at the outset of the confrontation, defendant was the initial aggressor. The Court of Appeals panel concluded that the trial court had erred by finding that defendant fired two shots from his car at the outset of the confrontation with Johnson. The panel observed that "[o]nly the first shot was attributed to Reese based on Williams indicating she heard the shot and assumed it was from his vehicle."[79] The panel also determined that "[t]here is no testimony or evidence to identify who fired the second shot or where it originated."[80] However, Williams testified that she heard two gunshots, at least one of them coming from the car that she testified was defendant's. Although Williams did not know the source of the second gunshot, it was not clearly erroneous for the trial court to conclude, on the basis of the logical inferences drawn from Williams's testimony, that defendant fired both shots from his car. Moreover, Long's testimony was consistent with this conclusion because Long testified that defendant's car arrived at his and Johnson's

---

[78] *Id.* at 709-710.

[79] *Reese*, unpub op at 3.

[80] *Id.*

residence shortly after he heard the two gunshots from the direction of defendant's car. There being evidence to support the trial court's conclusion, the Court of Appeals erred by rejecting the trial court's conclusion.

Next, the Court of Appeals concluded that "it seems reasonable to assume that Johnson did not feel threatened or intimidated by this random, preceding gunfire . . . ."[81] To begin with, the Court of Appeals' conclusion does not disprove the trial court's conclusion that defendant was the initial aggressor. Even so, the Court of Appeals' conclusion was erroneous. The panel reached its conclusion by noting that Johnson "continued [to] ambulat[e] toward Reese and Long's house and engag[ed] Reese in conversation . . . ."[82] However, the undisputed testimony is that Johnson was walking toward *his own* house, not defendant's house, a point that the trial court correctly appreciated and that severely undermines the Court of Appeals' theory that defendant could not have felt threatened or intimidated by the initial gunshots. Moreover, although there was testimony that Johnson "engag[ed] Reese in conversation," that conversation was hardly premised on the lack of a perceived threat. Rather, Long testified that Johnson asked, "[W]hat's up with that[?]" In interpreting this question, the trial court "infer[red] from that statement that he's wondering, [']what the heck you doing shooting a gun off by his house[?']" While this question could have been innocuous, given the *context* of the situation, the trial court's interpretation of this exchange was not clearly erroneous. The trial court concluded that Johnson did not view the preceding gunfire as

---

[81] *Id.*

[82] *Id.*

"random," as the Court of Appeals opined, but saw it as an aggressive act. This conclusion was not clearly erroneous. Thus, when all the circumstances are considered as a whole, the Court of Appeals erred by discounting the trial court's factual conclusion that as the initial aggressor in the shootout between defendant and Johnson, defendant was not entitled to use the doctrine of self-defense as justification for shooting Johnson.

Although the trial court went on to discuss this finding in the context of imperfect self-defense, it remains relevant to reviewing the trial court's conclusion that defendant was *not* entitled to self-defense as a complete justification for shooting Johnson. This Court reiterated in *Riddle* that an "'aggressor in a chance-medley (an ordinary fist fight, or other nondeadly encounter)'" who "'finds that his adversary has suddenly and unexpectedly changed the nature of the contest and is resorting to deadly force . . . must not resort to deadly force if there is any other reasonable method of saving himself.'"[83] In this case, the trial court correctly applied the law from *Riddle* and specifically found that defendant had *not* engaged in one such reasonable method of defusing the situation. The trial court explained: "[Defendant] didn't back off. He didn't say, okay, it didn't mean anything." The trial court did not clearly err by concluding that defendant was not entitled to self-defense as a complete justification to homicide.[84]

---

[83] *Riddle*, 467 Mich at 133, quoting Perkins & Boyce, Criminal Law (3d ed), p 1121.

[84] The Court of Appeals also claimed that the trial court did not fully analyze defendant's state of mind *at the time of the initial aggression*, and the panel provided extensive analysis on that point to posit a potential circumstance under which defendant could not benefit from the doctrine of imperfect self-defense. However, this analysis—while relevant to analyzing the malice element of murder—is irrelevant to defendant's claim that the evidence was insufficient to establish the elements of manslaughter. While the prosecutor argued that defendant had a malicious intent at the time of the initial

The Court of Appeals also examined the timing of the events and concluded that "there was a delay between the first shots and any further aggression between these combatants," which might have allowed for a cooling-off period.[85]   Thus, the panel speculated that "Johnson knew when he approached and engaged Reese verbally that he was no longer in imminent danger but elected to initiate a new conflict."[86]  However, as *Riddle* explained, an initial aggressor may find that his adversary "'suddenly and unexpectedly changed the nature of the contest and is resorting to deadly force.'"[87] While the trial court and the Court of Appeals disagreed about whether the events constituted a single, escalating conflict or separate incidents, the trial court's decision to treat them as a single, escalating conflict was not clearly erroneous.[88]

The Court of Appeals' opinion is deficient for all the foregoing reasons, but when considered as a whole, it is difficult to escape the conclusion that the panel simply substituted its interpretation of the testimony for the trial court's.  This is inappropriate when the standard of review requires an appellate court to accept the trial court's findings of fact unless they are *clearly erroneous*.[89]  This standard is higher than the standard for

---

aggression, it is not necessary for this Court to review the Court of Appeals' claim as it relates to the instant case, given that defendant has been acquitted of second-degree murder.

[85] *Reese*, unpub op at 4.

[86] *Id.* at 5.

[87] *Riddle*, 467 Mich at 133, quoting Perkins & Boyce, Criminal Law (3d ed), p 1121.

[88] The Court of Appeals' acknowledgement that "[*a*]rguably, Reese withdrew from the conflict," *Reese*, unpub op at 4 (emphasis added), further supports this conclusion.

[89] MCR 2.613(C); *Robinson*, 475 Mich at 5.

reviewing questions of law because the finder of fact often must choose between conflicting and contradictory testimony and is "in a far better position than is this Court"—or the Court of Appeals—"to determine [witnesses'] credibility."[90]

In summary, the evidence as outlined here was sufficient for a fact-finder to have concluded that defendant was guilty of each of the elements of voluntary manslaughter and that defendant was not entitled to use self-defense. Moreover, the trial court did not clearly err in rendering its findings of fact on the elements of voluntary manslaughter and defendant's self-defense claim. Accordingly, defendant is not entitled to a new trial on the ground that the evidence was insufficient.

## V. CONCLUSION

Because the common law of murder and manslaughter did not recognize the doctrine of "imperfect self-defense" at the time the Legislature codified those crimes, this Court concludes that the doctrine of imperfect self-defense does not independently mitigate murder to manslaughter. Rather, in deciding between murder and the lesser included offense of manslaughter, the fact-finder must determine whether the prosecution has proved the element distinguishing the two crimes: malice. While some "imperfect self-defense" situations may involve "provocation [as] the circumstance that negates the presence of malice,"[91] courts may not use the doctrine of imperfect self-defense to shortcut any analysis of the elements of the two crimes.

---

[90] *People v Szymanski*, 321 Mich 248, 253; 32 NW2d 451 (1948).

[91] *Mendoza*, 468 Mich at 536.

32

In this case, the Court of Appeals erred by concluding that the trial court's verdict was clearly erroneous. For the foregoing reasons, the trial court's verdict was not clearly erroneous and is affirmed. We therefore reverse the Court of Appeals' judgment ordering a new trial, vacate the opinion to the extent that it is inconsistent with the foregoing analysis, and remand to the Court of Appeals for the panel to consider defendant's remaining issue on appeal.[92]

Robert P. Young, Jr.
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra

---

[92] We do not disturb the Court of Appeals' affirmation of defendant's felon-in-possession and felony-firearm convictions because defendant has not cross-appealed those convictions.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellant,

v                                  No. 142913

VERDELL REESE, III,

       Defendant-Appellee.

_____

MARILYN KELLY, J. (*concurring in part and dissenting in part*).

I concur in the majority's decision to reinstate defendant's conviction for manslaughter but dissent from the pronouncement that the doctrine of imperfect self-defense does not exist in Michigan law. Any opining about the doctrine is unnecessary to resolve this matter and should be left for another day and a more appropriate case.

Defendant was convicted of manslaughter after a bench trial. In the Court of Appeals, he asserted that he was entitled to an acquittal on the basis of self-defense and that the trial judge's findings of fact were clearly erroneous. At issue was the judge's finding that defendant was the initial aggressor.

The Court of Appeals vacated the manslaughter conviction and remanded for a new trial. The prosecution appealed in this Court, asserting that the trial court's finding was not clearly erroneous and that defendant's manslaughter conviction should be reinstated.

The majority opinion agrees that the finding was not clearly erroneous. Because that is the question at issue on appeal in this Court, answering it is all that is needed to resolve the appeal. Hence, a determination whether imperfect self defense should continue to exist in Michigan law is unnecessary to the resolution of this case and irrelevant. The appropriate holding is that the Court of Appeals incorrectly applied the clear error standard in setting aside the finding that defendant was the initial aggressor.

Because the trial court acquitted defendant of second degree murder, for the prosecution to renew the count would constitute double jeopardy.[1] As the prosecution stated in its arguments before this Court, we cannot now consider whether defendant should have been convicted of murder; that ship has sailed. At this point, the prosecution can charge and try defendant only for manslaughter. Hence, the doctrine of imperfect self-defense could not arise again in this matter, it not being a mitigating defense to manslaughter. Consequently, answering the question in this decision of whether imperfect self-defense exists has no effect on the relief available to either party.

Further supporting this position is the fact that both parties stated at oral argument that this is not the case to address the doctrine of imperfect self-defense. However intertwined the doctrine may have been with the lower court's ruling, we need not adjudicate its appropriateness in order to decide the case. The majority has selectively dissected the defense out of the lower court's analyses and dispatched it from Michigan's jurisprudence despite the fact that doing so was unnecessary and neither party requested

---

[1] See also MCL 768.33, which states: "When a defendant shall be acquitted or convicted upon any indictment for an offense, consisting of different degrees, he shall not thereafter be tried or convicted for a different degree of the same offense . . . ."

it.  I would reverse the Court of Appeals' judgment and reinstate defendant's conviction for manslaughter.  But I would not reach out to strike down the doctrine of imperfect self-defense.

Marilyn Kelly
Michael F. Cavanagh
Diane M. Hathaway