*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TERRANCE POOLE,

        Defendant-Appellant.

UNPUBLISHED
August 10, 2023

No. 362176
Wayne Circuit Court
LC No. 21-005355-01-FC

Before: BOONSTRA, P.J., and LETICA and FEENEY, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of voluntary manslaughter, MCL 750.321, carrying a concealed weapon (CCW), MCL 750.227, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). The trial court sentenced defendant to prison terms of 100 months to 15 years imprisonment for the manslaughter conviction and three to five years imprisonment for the CCW conviction, to be served concurrently to each other and consecutively to the statutory 2-year prison term for the felony-firearm conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On May 21, 2022, at the intersection of Macomb St. and Saint Antoine St. in Detroit, defendant shot Antonio Rayner following a physical altercation involving defendant and several other individuals. Defendant's then-girlfriend, Aniyah Shannon, and a family friend, Talasha Robinson, were walking in the Greektown area of downtown Detroit when defendant accidently bumped into a man on the street. Defendant apologized for colliding with the man, but the man wanted a second apology. Defendant did not comply, and the argument escalated and turned physical, with several punches exchanged between defendant and approximately three or four other persons. Rayner was not the person with whom defendant initially collided, nor was Rayner involved in the physical altercation.

-1-

Defendant testified that during the altercation he heard a person say, "remember he got (Glick) [sic][1], which was referring to the gun[,]" but defendant did not know who had spoken. Defendant remembered seeing a person, whom defendant subsequently learned was Rayner, openly carrying a firearm. After defendant was able to break away from the fight, he took two steps backward and allegedly observed Rayner with a firearm in his right hand, with his arm down at his side. Defendant drew his own firearm (a .45-caliber Glock pistol), and began shooting in the direction of Rayner and the persons involved in the physical altercation. After defendant fired his gun, Rayner turned away from defendant and attempted to run away, falling to the ground and dropping his firearm, a 9mm Springfield pistol. Defendant observed Rayner fall to the ground, and continued to point his gun at him.

Defendant claimed that he heard unidentified gunshots behind him and ducked and ran towards Rayner, who was lying on the ground, while firing his weapon at him. Defendant shot Rayner at least once while he was lying on the ground and defendant was running past him. Defendant was arrested on Gratiot Avenue and escorted by officers to the Detroit Detention Center, where he was interviewed by Sergeant Dejia Blackwell. Defendant's firearm, the .45-caliber Glock handgun, was recovered from a hole underneath the stairs of the former Detroit Police Headquarters. The ballistics investigation, and subsequent autopsy of Rayner, revealed that eleven bullets were fired from the .45-caliber Glock handgun, five of which hit Rayner, while the victim's Springfield pistol had not been fired. Rayner was hospitalized for approximately 21 days following the shooting, before succumbing to his injuries on June 11, 2021. Several surveillance videos capturing the incident and the seizure and arrest of defendant were admitted into evidence during the trial.

Defendant argued at trial that he had killed Rayner in self-defense. The jury acquitted defendant of the charge of first-degree murder, but convicted defendant as described. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Byczek*, 337 Mich App 173, 182; 976 NW2d 7 (2021). In evaluating a defendant's claim concerning the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecution to discern whether any trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Head*, 323 Mich App 526, 532 (2018). "With regard to an actor's intent, because of the difficulties inherent in proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v McKewen*, 326 Mich App 342, 347 n 1; 926 NW2d 888 (2018).

---

[1] The parentheses around the word "Glick" are present in the transcript copy provided to this Court. The record contains no references to any type of firearm named or nicknamed "Glick" in this case, although defendant did possess a .45-caliber Glock pistol.

## III. ANALYSIS

Defendant argues that there was insufficient evidence for the jury to convict him of voluntary manslaughter because he acted in self-defense. We disagree.

"In a criminal proceeding, the defendant has a constitutional right to have the prosecution prove his or her guilt beyond a reasonable doubt . . . ." *People v Likine*, 492 Mich 367, 407; 823 NW2d 50 (2012). In this case, defendant was convicted of voluntary manslaughter. "A defendant properly convicted of voluntary manslaughter is a person who has acted out of a temporary excitement induced by an adequate provocation and not from the deliberation and reflection that marks the crime of murder." *People v Mendoza*, 468 Mich 527, 535; 664 NW2d 685 (2003) (quotation marks and citation omitted). "To prove that a defendant committed voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013) (quotation marks and citations omitted). "However, provocation is not an element of voluntary manslaughter; rather, it is a circumstance that negates the presence of malice." *Id*. Additionally, although the doctrine of "imperfect self-defense" does not exist in Michigan, many circumstances that may be labelled "imperfect self-defense" in other jurisdictions can "nevertheless provide grounds for a fact-finder to conclude that the prosecution has not proved the malice element that distinguishes murder from manslaughter." *People v Reese*, 491 Mich 127, 150-151; 815 NW2d 85 (2012).

Defendant asserted the affirmative defense of self-defense. "At common law, the affirmative defense of self-defense justifies otherwise punishable criminal conduct, usually the killing of another person, 'if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself.' " *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010), quoting *People v Riddle*, 467 Mich 116, 127; 649 NW2d 30 (2002). However, "a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor." *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013).

"With the enactment of the Self-Defense Act (SDA), MCL 780.971 *et seq*., the Legislature codified the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *Dupree*, 486 Mich at 708. "Specifically, the SDA modified the common law's duty to retreat that was imposed on individuals who were attacked outside their own home or were not subjected to a sudden, fierce, and violent attack." *Guajardo*, 300 Mich App at 35 (quotation marks and citation omitted). MCL 780.972(1) of the SDA provides, in pertinent part:

> An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if . . . .

(a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

"Once a defendant satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution bears the burden of disproving the affirmative defense of self-defense beyond a reasonable doubt." *Dupree*, 486 Mich at 712. To ascertain whether the jury properly found that the prosecution refuted a defendant's claim of self-defense beyond a reasonable doubt, it is essential to determine whether "the circumstances justified his actions." *Id*. at 707 (quotation marks and citation omitted).

In this case, the circumstances leading up to the shooting were such that a rational trier of fact could find beyond a reasonable doubt that defendant was not justified in shooting Rayner. While defendant was outnumbered in the initial physical altercation, Rayner was not involved, and there was no testimony that Rayner verbally threatened defendant or physically attacked him. Rather, the video evidence at trial shows that Rayner separated himself from the group during the original confrontation with defendant, and was several feet away while defendant was engaged in combat. Defendant testified that he initially feared for his life after hearing someone yell, "he got (Glock), which was referring to the gun[,]" and remembering that Rayner was openly carrying a firearm. However, other circumstances surrounding the shooting, in addition to defendant's own testimony, discredited defendant's assertion that he was honestly and reasonably afraid of Rayner imminently killing him or causing him great bodily harm.

There were notable discrepancies concerning defendant's assertions about the unidentified declarant's statements defendant claimed to have heard, as well as the direction of the gunshots heard and the visibility of Rayner's firearm, based on defendant's statement to police and his subsequent testimony at trial. While defendant asserted on direct examination that he had observed Rayner raising his pistol towards defendant, defendant made no such statement during his interview with Sergeant Blackwell, instead stating that he only fired his handgun to "clear the area. "Defendant also stated during his police interrogation: "I just saw [Rayner] like this," and pantomimed how Rayner was holding the gun on the right side of his body pointed downwards. Further defendant testified that he ran *toward* Rayner, pointed his firearm, and fired at Rayner, partly because defendant heard unidentified gunshots and suspected that Rayner had fired at him. However, defendant previously stated during his interrogation, "I heard shooting *behind me*, I was trying to get out of there."

Further, the surveillance-camera footage admitted at trial shows defendant running toward Rayner while Rayner is running away from defendant, and defendant repeatedly shooting Rayner while he is lying on the ground. Rayner's pistol is clearly visible falling from his hand and lying several feet away from Rayner's prone body. The jury could conclude that defendant observed Rayner fall to the ground and lose control of his pistol, and nonetheless continued to fire at, and hit, Rayner as he lay on the sidewalk.

Additionally, while the medical examiner testified that she could not distinguish whether the gunshot wounds to Rayner's back were entry or exit wounds due to the extensive hospitalization of the victim before his death, the video depicting the shooting clearly shows that

defendant continued to fire his gun after Rayner turned away. Furthermore, the medical examiner detailed the "pseudo-stippling" discovered on Rayner's buttocks, right arm, right elbow, right leg, right lateral leg, and right posterior leg, which demonstrated that he was shot at close range. See *People v Unger*, 278 Mich App 210, 231; 749 NW2d 272 (2008) (stating a defendant's intent can also be inferred from the nature and location of a victim's wounds).

The only evidence defendant offered that he acted in self-defense was his own testimony that Rayner drew his firearm from its holster and began to raise it toward defendant, but there was evidence to the contrary, including video footage that shows that Rayner never raised his firearm. There was also evidence that Rayner never fired his weapon at all.

In sum, the evidence allowed a rational jury to conclude that defendant fired at Rayner eleven times, and struck him five times, despite the lack of an imminent threat or danger to defendant, and that defendant did not reasonably believe that Rayner constituted such a threat or danger. *Robinson*, 475 Mich at 5; *Riddle*, 467 Mich at 127. Defendant also fled the scene and hid his gun. The evidence was therefore sufficient to defeat defendant's claim of self-defense, and to support his conviction of voluntary manslaughter. *Id*.

Affirmed.

/s/ Mark T. Boonstra
/s/ Anica Letica
/s/ Kathleen A. Feeney