PEOPLE v. YOUNGER.

1. HOMICIDE—MURDER—MANSLAUGHTER.

Murder in the first degree requires proof of premeditation, deliberation, and malice; manslaughter is a homicide which is not the result of premeditation, deliberation, and malice but, rather, which is the result of such provocation that an ordinary man would kill in the heat of passion before a reasonable time had elapsed for passions to subside and reason to resume control (CL 1948, §§ 750.316, 750.321).

2. SAME—MANSLAUGHTER.

Manslaughter is a killing which is the product of passion, in a moment of frenzy or of temporary excitement, and devoid of actions which require unimpassioned calculation (CL 1948, § 750.321).

3. SAME—MANSLAUGHTER.

A homicide was not the product of provocation which unseated reason and allowed free reign of passion if there were actions manifesting deliberation (CL 1948, § 750.321).

REFERENCES FOR POINTS IN HEADNOTES

[1] 26 Am Jur, Homicide § 12.
[2] 26 Am Jur, Homicide §§ 17, 19.
[3, 4] 26 Am Jur, Homicide § 22 et seq.
[5] 26 Am Jur, Homicide § 536.
[6, 7] 53 Am Jur, Trial § 962.
[8] 53 Am Jur, Trial § 486.

4. SAME—MANSLAUGHTER—PROVOCATION AS DEFENSE—EVIDENCE.

It is appropriate to inquire into the legal sufficiency of asserted provocation as a defense to a homicide only if the act of homicide can be found to be that of an ordinary man responding to the heat of passion and not that of an ordinary man functioning with deliberation (CL 1948, §§ 750.316, 750.321).

5. SAME — MURDER — MANSLAUGHTER — INSTRUCTIONS — THEORY OF CASE.

Defendant is not entitled to instruction on manslaughter or an instruction on issue of provocation where record indicates domestic discord and pending legal action, defendant came home unexpectedly and found wife and guests drinking, defendant procured rifle and found ammunition for it in basement, told wife to kneel and pray, listened to her plead for her life for several minutes, and shot her 16 times, his actions indicating not momentary impulse of passion but methodical execution (CL 1948, §§ 750.316, 750.321).

6. JURY—PROTRACTED SERVICE—COERCION OF VERDICT.

Allowing jury to deliberate until early hours of morning on last day of trial for murder, thus making a 16-hour day of service, held, not reversible error as judicial coercion, where record discloses no other circumstances suggesting coercion and no objection was made to the protracted service (CL 1948, § 750-.316).

7. SAME—PROTRACTED SERVICE.

Judge should state on record reason which compels pursuing jury verdict beyond normal close of judicial day, giving parties opportunity to state objections on record to continuation of proceedings.

8. CRIMINAL LAW—PROSECUTING ATTORNEY—ARGUMENT TO JURY—RECORD—PERSONAL BELIEF.

Claim that prosecuting attorney was allowed to state personal belief of defendant's guilt during argument to jury held, not supported by record, where nothing is found by the court which approaches an assertion of personal belief, and there are no objections by defendant's counsel or requests to charge the jury about objectionable arguments in the record.

Appeal from Genesee; Newblatt (Stewart A.), J., following denial of delayed appeal by Court of Ap-

peals (No. 2,946). Submitted March 5, 1968. (Calendar No. 18, Docket No. 50,611.) Decided May 6, 1968.

Lewis D. Younger was convicted of murder in the first degree. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Robert F. Leonard,* Prosecuting Attorney, and *Paul G. Miller, Jr.,* Assistant Prosecuting Attorney, for the people.

*W. Charles Kingsley,* for defendant on appeal.

SOURIS, J. Defendant was convicted by a jury of first-degree murder[1] for killing his wife.[2] The homicide occurred at about 3 o'clock one morning when defendant returned home unexpectedly and found his wife, a female neighbor and his wife's male employer in defendant's home having a drink. It was defendant's claim at trial, and it is his claim on appeal, that the presence of the male in his home at that hour was the culminating act of provocation, preceded by many prior acts of infidelity by his wife and broken promises of reformation, that precipitated his killing his wife in an act of passion, thereby reducing the homicide from one of murder to manslaughter.

Defendant's principal claims on appeal are that (1) he should have been accorded greater freedom than was allowed him in introducing evidence of his wife's past misconduct in support of his claim that he was subjected to such provocation that an ordi-

---

[1] CL 1948, § 750.316 (Stat Ann 1954 Rev § 28.548)—REPORTER.

[2] Defendant's claim of appeal was dismissed by the Court of Appeals for lack of progress. Subsequently, that Court denied a delayed application for leave to appeal. We granted leave, on defendant's delayed application to this Court. 379 Mich 764.

nary man would kill in the heat of passion and (2) that the jury should have been instructed to consider such evidence of his wife's past misconduct in determining the sufficiency of the asserted provocation to constitute the homicide manslaughter rather than murder. This is not a case in which temporary insanity was pleaded as a defense. See *People* v. *Garbutt* (1868), 17 Mich 9 (97 Am Dec 162). Accordingly, we need not express an opinion whether the circuit judge's challenged evidentiary rulings and jury instructions would have been adequate had such defense been in issue.

Murder and manslaughter have been distinguished frequently in our reports. Murder in the first degree requires proof of premeditation, deliberation and malice. Manslaughter, on the other hand, is a homicide which is not the result of premeditation, deliberation and malice but, rather, which is the result of such provocation that an ordinary man would kill in the heat of passion before a reasonable time had elapsed for the passions to subside and reason to resume its control. See *People* v. *Scott* (1859), 6 Mich 287; *Maher* v. *People* (1862), 10 Mich 212 (81 Am Dec 781); *People* v. *Lilley* (1880), 43 Mich 521; *People* v. *Holmes* (1896), 111 Mich 364; *People* v. *Poole* (1909), 159 Mich 350 (134 Am St Rep 722); and *People* v. *Ryczek* (1923), 224 Mich 106.

At the threshold of every manslaughter case, the killing, to be manslaughter and not murder, must have been the product of an act of passion; it must have been committed in a moment of frenzy or of temporary excitement. Manslaughter is homicide devoid of actions which require unimpassioned calculation for their accomplishment. If there be actions manifesting deliberation, it cannot be said, legally, that the homicide was the product of provocation which unseated reason and allowed passion free

rein. Thus, the nature and quality of the act of homicide first must be examined to determine whether it is that of an ordinary man responding to the heat of passion or that of an ordinary man functioning with deliberation. Only if the defendant's actions can be found to be acts of passion is it appropriate to inquire into the legal sufficiency of the asserted provocation. In this case of Younger, we conclude that defendant's own conduct on the fatal night precludes a finding that he had been bereft of reason by passions run rampant. A description of his actions, much of which is conceded by defendant and the balance of which is uncontradicted on this record, establishes the point we make.

Defendant, who worked in Detroit and normally returned to his home in Flint only on weekends, arrived at his Flint home unexpectedly at about 3 o'clock one morning and found his wife and two others, one of whom was male, having a drink. He greeted his wife's guests and, as he proceeded through the living room to an adjoining bedroom, his wife told him that one of his dogs had died. Without response, he entered the bedroom, kissed his sleeping child and began to cry. An unspecified time later he left the bedroom and went into the basement where he dug "furiously" into a carrying bag in which he had placed some of his hunting equipment and, after some difficulty, he found some shells for his .22-caliber rifle. He then removed the rifle from its cover, loaded the rifle and returned upstairs. As he did so, his wife's male guest was departing, having finished his drink; but the female guest remained.

Defendant's testimony of what transpired next was:

"And as I approached I says, 'Nita—' I advised her, I says, 'Anita, get on your knees and pray.'

"She said, 'Honey, what's wrong? What's wrong?'

"I says, 'You promised me one thing, you invariably do just the opposite. They [defendant's children] do not have to live like this.'

"And from that point on she started saying a lot of things: 'Please give me another chance. I will do better. Don't do this. What's wrong, Honey? I will do anything that you say do. You just say it.'

"I said, 'I know what you are going to do, what you have repeatedly done.'

"Pearl [the female guest] turned around and she made some remark. I do not know verbatim or exactly what Pearl said, but my wife remarked to her to do as I had said do. And at this particular point is when I cursed at her and she says 'Dave, I will change. Just give me another chance. I will change. I will promise I will change.' And at this precise moment is when I pulled the trigger."

Pearlie Shook, the female guest, testified that defendant kept his wife on her knees for about 4, 5, or 6 minutes. Her description of the homicide was:

"*A.* And he was standing behind the davenport. And he said to Mrs. Younger something like this: 'Anita, thought I told you that I would never give you another penny of my money.'

"And she said, 'What money?' And she say, 'I haven't asked you for any money. I don't want any money.'

"He say, 'Well, I have the papers here in my pocket to prove.' You know, I guess the divorce or something, I don't know. But then he says, 'You are such of a great believer, get on your knees and pray to your Maker.'

"And she went, like, 'Oh, Dave, honey,' you know, 'what's wrong?' you know.

"*Q.* Pardon me. Now I'm sorry, I missed that last part.

"*A.* 'Oh, Dave, honey, what's wrong?'

"So he said, 'Get on your knees and I mean get on them now,' or something like this. And when she got on her knees at the davenport like this and start praying and pleading with him. So he say—

"*Q.* Do you know what she said exactly? Could you recall?

"*A.* She was saying, 'Oh honey, don't do this,' you know.

"He say, 'You know I am going to do this, don't you?' No, he said— Yes, he said, 'You know I am going to do this, don't you?'

"She say, 'Honey, I know you will do it.'

"He say, 'No, you know I am going to do this.'

"So after this she begged, you know, and pleaded, 'Let me live for Ramata and —'

"*Q.* For who?

"*A.* Ramata. That's the baby. And I said something like, 'Dave, don't do this. Think about the children,' or something. And he asked me not to move and she told me don't move because he would shoot me. So I stood there. And by it being so much noise, her praying and begging him not to do this, they woke up Renee; that's her daughter. I think she is six years old. And when Ramata—I mean, Renee, runs out of the bedroom— But before this, she had begged and begged and Ramata run out of the bedroom.

"*Q.* You mean Renee?

"*A.* Renee, yes. The oldest girl. And when she went out the bedroom she run straight to her mother. So Mrs. Younger was still pleading and begging, you know, and so I grabbed the child. And Mr. Younger said something like, 'Look at this bitch squirm,' or something like that; something like that. And he shot her the first time then he just kept shooting."

It appears, from the closing arguments of both counsel, that defendant shot his wife 16 times. From the foregoing, it is apparent to us that defend-

ant did not kill his wife in a momentary impulse
of passion but, rather, that he proceeded methodical-
ly to execute her in cold blood. On such facts, de-
fendant was not entitled to any instruction on man-
slaughter and, thus, the circuit judge's evidentiary
rulings and his refusal to instruct on the issue of
provocation, as to which defendant complains on
appeal, were not reversible errors.

Defendant also complains on appeal that it was
reversible error for the circuit judge to allow the
jury to deliberate upon its verdict until after one
o'clock in the morning following the last day of trial.
He asserts that keeping the jury at its task for a
16-hour day amounts to judicial coercion of its ulti-
mate verdict.

The record in this case shows no objection by
defendant's counsel or by the jury to the protracted
service put in by the jury on the last day of trial.
Absent any such objection, we will not reverse the
conviction.[3] However, for the future it is suggested
that the circuit judge state on the record what reason
compels pursuing jury verdict beyond the normal
close of the judicial day. It necessarily follows that
counsel for the parties should be accorded an oppor-
tunity at this point, and anytime thereafter they
wish to do so, to state their objections, if there
be any, on the record to continuation of proceedings.

Defendant's last claim of reversible error is that
the prosecutor was allowed to state his personal
belief of defendant's guilt during his arguments to
the jury. We have examined the arguments about
which complaint is made and find nothing which ap-
proaches an assertion of such personal belief.
Furthermore, we find no objections by defendant's

---

[3] However, if the record disclosed circumstances, in addition to
prolonged deliberation, suggesting judicial coercion of a jury's ver-
dict, we would not hesitate to reverse even absent objection by
counsel. See *Yinger* v. *Secord* (1963), 369 Mich 364.

counsel to the prosecutor's arguments, nor do we find in the appellant's appendix any requests made of the circuit judge to charge the jury with reference to such allegedly objectionable arguments. We find no error.

Affirmed.

Dethmers, C. J., and Kelly, Black, T. M. Kavanagh, O'Hara, Adams, and Brennan, JJ., concurred.