*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
August 29, 2024

v

Nos. 362388; 367180
Muskegon Circuit Court

KRISTOPHER HARLAN JOESEL,

LC No. 2020-003689-FC

        Defendant-Appellant.

Before: GADOLA, C.J., and K. F. KELLY and MARIANI, JJ.

PER CURIAM.

In Docket No. 362388, defendant Kristopher Harlan Joesel appeals by right his jury conviction of second-degree murder, MCL 750.317, arising out of the stabbing death of Laura Sanchez. The trial court sentenced Joesel to serve 33 years to 90 years in prison. Joesel argues that the trial court erred when it refused to instruct the jury on manslaughter and erred when it denied his request to present evidence that Sanchez had alcohol and cocaine in her system. He also maintains that the trial court erred when it scored Offense Variable (OV) 19 of the sentencing guidelines and erred when it imposed a sentence that was disproportionate to his offense and to him as an offender.

In Docket No. 367180, Joesel appeals by right the trial court's order of restitution.[1] He argues that the trial court had no authority to order him to reimburse Sanchez for lost income and, in the alternative, argues that the trial court improperly included Sanchez's income losses on the basis of speculative evidence. He similarly states that the order should not have included costs for Sanchez's family's future counseling expenses for which there was no evidentiary support.

We conclude that Joesel has not identified any errors that warrant reversing his conviction. He has also not identified any error in the scoring of OV 19. He has, however, shown that the trial

---

[1] This Court consolidated the appeals on its own initiative for the efficient administration of the appellate process. *People v Joesel*, unpublished order of the Court of Appeals, entered August 8, 2023 (Docket Nos. 362388 and 367180).

court did not provide sufficient justification for the minimum sentence that it ordered him to serve. Joesel has also shown that the trial court erred in its order of restitution. Accordingly, we affirm in Docket No. 362388, but remand for resentencing. In Docket No. 367180, we vacate in part the trial court's order of restitution.

## I. BASIC FACTS

In the early morning hours of July 18, 2020, Joesel and a friend went to a bar called Mike's Inn for a drink. The bar was directly across the street from an apartment complex—the Amazon Apartments—where Joesel lived. At about 1:00 a.m. Joesel asked the bartender for another beer in a manner that offended the bartender. As a result, the bartender suggested, in colorful terms, that Joesel leave. Joesel responded by knocking things off the bar. A bouncer attempted to restrain Joesel, and Joesel shoved him with such force that the bouncer struck and broke a lottery machine.

Two bartenders came to assist the bouncer and dragged Joesel over to a pool table between the bar and the front door. They struggled to keep Joesel under control, and Joesel spat in one bartender's face while swinging at them. A patron came over to the pool table, and Joesel pulled his legs up and forcefully kicked the patron. The patron lifted Joesel off the table, and Joesel, the patron, and the two bartenders then fell. Testimony established that the bartenders and patron were then able to drag Joesel outside.

Once outside, Joesel punched a patron who was holding the door open and split his lip so badly that he needed stiches. Joesel then went back into the bar only to be escorted out a different entrance. Once outside, Joesel urinated on the bouncer's truck. Joesel then walked down an alley and over to his apartment complex. The video evidence from the apartment complex showed that it was about 1:09 a.m. when Joesel arrived there.

After he returned to his apartment, Joesel sent an angry e-mail to the apartment manager. He apparently referred to the altercation at the bar: "Hi, Degenerate Scum. You owe money, and your resident just assaulted me for being white and said to leave the neighborhood." Joesel then grabbed a hunting knife and went back downstairs. Joesel encountered his friend from the bar in the foyer of the Amazon Apartments building, which was accessible to the public. Joesel let his friend into the secure area of the Amazon building and walked back to Mike's Inn at approximately 1:25 a.m.

Sanchez was at Mike's Inn with her boyfriend, Manuel Suarez. She and Suarez were not involved in Joesel's scuffle at the bar, but Suarez decided to leave shortly after the scuffle. Suarez and Sanchez went to Suarez's car, which was parked on the street outside the bar, and they spoke. Joesel walked by while Suarez sat in his car, and Suarez felt the back end of his car "go down." Joesel was apparently walking past the cars parked in front of the bar and puncturing their tires. Suarez and Sanchez got out of the car, and Sanchez began yelling at Joesel. Joesel walked back to the Amazon Apartments, and Suarez restrained Sanchez from following him. Suarez went back into the bar and told others about the tire incident. Sanchez apparently walked over to the Amazon Apartments at that time and tried to follow Joesel inside, but she was not able to enter the secure area. She then went back across the street to the bar.

The video evidence showed that after returning to his apartment, Joesel put up his hair, put on a hat, and went back down the elevator. He again left the Amazon Apartments with his knife and headed in the direction of Mike's Inn at about 1:31 a.m. Bar patrons were examining the cars parked in front of the bar and one patron was on the phone with a 911 dispatcher. Someone recognized Joesel as he approached and indicated that he was outside. Sanchez went toward Joesel to confront him, and Joesel decided to return to the apartment complex.

The video from the Amazon building's foyer showed Joesel return to the door after only being outside for about one minute; he entered the foyer, and Sanchez approached as he entered. Joesel turned and looked at Sanchez as he pulled the door shut behind him; he leaned forward a bit and appeared to say something to Sanchez. She pushed the door and appeared to speak to Joesel. Joesel then turned his back to Sanchez and walked to the panel that would allow him to key into the secure area of the apartment building. He switched the knife from his left hand to his right hand as he approached the panel. Sanchez then opened the door, and Joesel looked back at her. They appeared to say things to each other.

Joesel again turned away from Sanchez. He pulled at something on his left side with his left hand by the panel and appeared to be ignoring Sanchez. At that point, Sanchez ran toward Joesel and shoved him into a bank of mailboxes. Joesel turned suddenly and thrust his knife at Sanchez three times, the third time occurring after Sanchez had been forcefully stabbed twice and was moving away from Joesel. The video showed an instant stream of blood flowing from Sanchez's leg. Sanchez retreated from Joesel and stood for a moment by the door to the outside. She looked down and saw the blood from her leg.

The video showed that Joesel then calmly walked to the secure door as two men reached the door to the foyer. Sanchez's leg was bleeding profusely. When the secure door did not open, Joesel walked back to the panel and triggered it again. Sanchez approached, raised her arms, and stated something. Joesel ignored her, turned, and opened the secure door. He then left the room as Sanchez staggered and fell. It was 1:32 a.m. Sanchez died shortly thereafter.

Police officers arrested Joesel later that morning and the prosecution charged him with open murder. At trial, Joesel argued that he acted in self-defense when he stabbed Sanchez to death. The jury rejected his defense and found him guilty of second-degree murder. Defendant now appeals.

## II. MANSLAUGHTER INSTRUCTION

### A. STANDARD OF REVIEW

Joesel first argues that the trial court abused its discretion when it refused to instruct the jury that it could find him guilty of manslaughter as a necessarily included lesser offense of second-degree murder.

This Court reviews de novo claims of instructional error. *People v Martin*, 271 Mich App 280, 337; 721 NW2d 815 (2006), aff'd in part 482 Mich 851 (2008). This Court, however, reviews whether a requested lesser-included-offense instruction was appropriate under the facts of the case for an abuse of discretion. *People v Jones*, 497 Mich 155, 161; 860 NW2d 112 (2014). A trial

court abuses its discretion when it selects an outcome that falls outside the range of principled outcomes. *Id.* A trial court necessarily abuses its discretion when it premises its decision on an error of law. *People v McFarlane*, 325 Mich App 507, 517; 926 NW2d 339 (2018). To warrant reversal, a "defendant must show that it is more probable than not that the trial court's failure to give the requested instruction undermined the reliability of the verdict." *People v Tierney*, 266 Mich App 687, 714; 703 NW2d 204 (2005).

## B. ANALYSIS

Criminal defendants have the right to a properly instructed jury. See *People v Mills*, 450 Mich 61, 80-81; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). That includes the right to have the jury instructed on an applicable necessarily included lesser offense. *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002). Voluntary manslaughter is a necessarily included lesser offense of second-degree murder. See *People v Mendoza*, 468 Mich 527, 540-541; 664 NW2d 685 (2003). Therefore, Joesel would be entitled to have the jury consider that offense if a rational view of the evidence would support the instruction. See *id.* at 541. The requested instruction must be supported by evidence that demonstrates that the element distinguishing the two crimes was sufficiently disputed that the jury could consistently find the defendant innocent of the greater offense and guilty of the lesser offense. *Cornell*, 466 Mich at 352.

Voluntary manslaughter is murder without malice. See *Mendoza*, 468 Mich at 534. It is an intentional killing done in the heat of passion rather than from wickedness of heart or cruelty or reckless disposition. *Id.* at 535, citing *Maher v People*, 10 Mich 212, 219 (1862); see also *People v Townes*, 391 Mich 578, 589; 218 NW2d 136 (1974) (observing that voluntary manslaughter is an intentional killing in which the killer's malice was negated by provocation and killing in the heat of passion). To establish voluntary manslaughter, there must be evidence that "the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *Mendoza*, 468 Mich at 535.

The first inquiry is whether there was evidence that the killing was an act of passion—that is, whether there was evidence that the defendant killed "in a moment of frenzy or of temporary excitement." *People v Younger*, 380 Mich 678, 681; 158 NW2d 493 (1968). If the evidence showed that the defendant acted with deliberation, "it cannot be said, legally, that the homicide was the product of provocation which unseated reason and allowed passion free rein." *Id.* at 681-682. Accordingly, a reviewing court must first examine the "nature and quality of the act of homicide" to determine whether it was that of "an ordinary man responding to the heat of passion or that of an ordinary man functioning with deliberation." *Id.* at 682. "Only if the defendant's actions can be found to be acts of passion is it appropriate to inquire into the legal sufficiency of the asserted provocation." *Id.*

To satisfy the provocation element, the provocation must have actually caused the defendant to act out of passion rather than reason—it must have caused emotions so intense that it distorted the defendant's very process of choosing. *People v Pouncey*, 437 Mich 382, 389; 471 NW2d 346 (1991). The provocation must also be adequate as judged by a reasonable person. *Id.* "Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter." *Id.* Stated in other terms, the provocation must be of a kind that might cause even

-4-

a reasonable person to lose control of their decision making. See *Townes*, 391 Mich at 589-590. Acting in the heat of passion means acting while in a state of mind incapable of cool reflection. See *id*. at 589 n 3.

Generally, mere words and insults will not constitute adequate provocation. *Pouncey*, 437 Mich at 391. Even a physical battery might not rise to the level of an adequate provocation. To constitute adequate provocation, a battery must not have been privileged (i.e., committed in self-defense) and must have been a hard blow inflicting considerable pain or injury. See Perkins & Boyce, Criminal Law (3rd ed), p 92; see also 40 CJS, Homicide, § 122 ("However, physical contact between a defendant and a victim is not always sufficient to warrant a manslaughter instruction even when the victim initiated the contact; this is particularly so when a defendant is armed with a deadly instrument and a victim is not.").[2]

Ordinarily, whether a particular act amounted to adequate provocation is a question of fact for the jury. *Pouncey*, 437 Mich at 390. This Court has stated that a defendant need only have a "modicum of evidence of provocation" to support a manslaughter instruction, but the evidence must, nevertheless, be sufficient to permit the jury to find manslaughter. See *People v King*, 98 Mich App 146, 152; 296 NW2d 211 (1980). If no reasonable jury could find that the provocation was adequate, then the trial court may properly refuse to instruct the jury on manslaughter. See *Pouncey*, 437 Mich at 392; see also *People v Darden*, 230 Mich App 597, 604; 585 NW2d 27 (1998) ("[W]e conclude that there must be sufficient evidence to allow a rational trier of fact to find adequate provocation by a preponderance of the evidence.").

When the evidence adduced at trial is considered as a whole, no reasonable jury could find that Joesel stabbed Sanchez under the influence of passion arising from Sanchez's act of pushing him into the mailboxes, let alone that Sanchez's provocation caused the passion, even if the provocation could be considered legally adequate. Testimony established that by about 1:00 a.m. on the night at issue, a bartender refused to serve Joesel more alcohol and suggested that Joesel should leave the bar in strongly worded language. Joesel immediately became angry and started knocking items off the bar. When a bouncer intervened, Joesel violently shoved the bouncer into a lottery machine and broke it. Two bartenders then joined the effort to remove Joesel from the bar.

The video evidence showed that it essentially took three grown men—including one with physically intimidating stature—to compel Joesel to leave. After being put outside, Joesel immediately and forcefully punched an older patron who simply held open the door to the bar. Joesel then deliberately reentered the bar and, after again being escorted outside, he urinated on an employee's truck. The evidence showed that Joesel was not only unafraid of the bar's staff and patrons, he actively confronted them.

The evidence of Joesel's calculated rage did not end with his expulsion from the bar. Joesel proceeded back to his apartment. The video evidence showed him to be in control and moving at

_____

[2] Learned treatises are not binding on this Court, but may be persuasive. See *Patrick v Turkelson*, 322 Mich App 595, 618 n 7; 913 NW2d 369 (2018).

a normal pace. He sent an e-mail to a person completely unrelated to the bar incident in which he cited the bar incident and interjected race. He then armed himself with a hunting knife. He calmly let a friend into the apartment building and escorted him up the elevator; after that, he left the building and walked across the street to methodically puncture the tires of cars parked outside the bar. When confronted by Sanchez after he deflated Suarez's car's tire, Joesel calmly walked back to his apartment. He then changed his appearance and immediately went back outside. He was still armed. Although Joesel claimed that he was going to retrieve his phone from the bar, the fact that he changed his appearance and continued to carry his knife strongly suggested that he was still angry and that he went outside to continue to express his anger in one way or another.

Joesel claimed that he immediately returned to his apartment because he feared the "mob" that had assembled outside the bar (a group that the evidence showed assembled to assess the damage that Joesel had inflicted to their vehicles) but the video evidence of the stabbing belied that claim. The video showed Joesel returning to the Amazon building's foyer and showed that Sanchez closely followed him. Joesel was not, however, moving particularly fast. Rather, he appeared calm and moved with due deliberation. He pulled the foyer's exterior door closed behind him, but his actions did not appear frantic or desperate. The video showed him pulling the door and leaning into the glass as if to taunt or insult Sanchez. He then proceeded to the panel that would allow him to use his key fob to enter the interior door. He looked at Sanchez when she entered. He did not show any sign of fear. The evidence showed that Joesel was 50 pounds heavier than Sanchez (and nearly a foot taller), armed with a hunting knife, and had nearly overpowered two grown men at the bar about 30 minutes earlier. He was also unafraid to enter a public space and vandalize multiple cars just outside a crowded bar.

The video did show that Sanchez, who again was of much smaller stature, ran toward and pushed Joesel, but the entire incident does not depict Joesel suddenly losing control as a result of a push from behind from a much smaller female. Rather, the video showed an already angered Joesel turn and viciously stab Sanchez. His first blow penetrated more than four inches into Sanchez's chest through two of Sanchez's ribs and pierced her left ventricle. The second thrust went three inches into her leg and severed her femoral artery. The two piercing blows required tremendous force to achieve that degree of penetration. Joesel then stabbed out again as Sanchez staggered back from the attack. Far from being disturbed by passion, Joesel turned to the panel, activated it, walked to the door, turned back to the panel, activated it again, and then calmly walked into the building's interior. He looked back at Sanchez briefly and then chose not to wait for the closest elevator, but instead used a different route to his apartment.

The circumstances showed that Joesel had been acting in a state of simmering rage for approximately 30 minutes before the encounter with Sanchez. Although he acted on anger, the evidence—and especially the video evidence—demonstrated that Joesel still acted with deliberation and control. He made numerous decisions that required forethought and calculated steps. In each instance, he chose to provoke others and escalate the disturbances that he initiated. Joesel specifically targeted others with violence who were not even involved in his expulsion from the bar. Joesel could have ended the sequence of events that led to Sanchez's murder at various points, but he chose to go down the path of continued confrontation and provocation. He claimed that he was retreating and that Sanchez's push caused him to snap and react on instinct, but the video evidence showed that he was not overcome with passion. The video depicted him reacting

with cold, calculated anger—lashing out, as he had all night, against the people that he felt had wronged him.

On the totality of this evidence, no reasonable jury could conclude that Sanchez's shove—even if it were legally adequate provocation—caused Joesel to lose control of his ability to make choices and act out of passion. See *Younger*, 380 Mich at 681-682. The "nature and quality of the act of homicide" did not show "an ordinary man responding to the heat of passion"; instead, it showed "an ordinary man functioning with deliberation." *Id*. at 682. Consequently, because there was insufficient evidence to allow a jury to find by a preponderance of the evidence that Joesel acted under the influence of passion,[3] the trial court did not err when it refused to instruct the jury that it could convict Joesel of the lesser included offense of manslaughter without regard to whether Sanchez's shove would have constituted adequate provocation. See *Pouncey*, 437 Mich at 392; *Darden*, 230 Mich App at 604.

On appeal, Joesel has not shown that it is more probable than not that the trial court's failure to give the requested instruction undermined the reliability of the verdict. See *Tierney*, 266 Mich App at 714. Joesel does not address the evidence that he was not under the influence of passion when he stabbed Sanchez. Instead, he focuses on the evidence that Sanchez rushed at him and pushed him into a wall. He argues that this evidence alone warranted a manslaughter instruction because it amounted to legally adequate provocation. As already discussed, the initial question was whether there was evidence that would permit a reasonable finder of fact to find that Joesel was acting out of passion at the moment of the stabbing. We do not agree that there was evidence from which a reasonable jury could find that he acted out of passion. In any event, we shall briefly examine the authorities that Joesel cites for the proposition that the trial court had to instruct the jury on manslaughter.

Joesel cites, among other cases, *People v Neal*, 201 Mich App 650; 506 NW2d 618 (1993). That case, however, did not involve the propriety of a manslaughter instruction; it dealt with whether the circuit court erred when it reversed the district court's refusal to bind over the defendant on charges of murder, but instead bound him over on a charge of manslaughter. See *id*. at 652, 655-656. This Court determined that the evidence showed that a white mob chased the defendant for up to a half mile after attacking one of the defendant's companions. All the while, the mob shouted racial epithets. The defendant shot the decedent, but only after warning him and telling him that he did not want to shoot. This Court determined that the evidence showed the defendant acted without malice sufficient to establish murder and that the circuit court erred when

---

[3] Joesel argues that the trial court's decision to instruct the jury on self-defense was inconsistent with its decision to deny an instruction on manslaughter. He relies on our Supreme Court's statement that what had been labeled imperfect self-defense can often be used as evidence of heat of passion. See *Reese*, 491 Mich at 150-153. The fact that things that might have been used to support a self-defense claim can sometimes be used to establish a heat of passion claim does not mean that a trial court must instruct the jury on manslaughter whenever the court instructs the jury on self-defense. Self-defense does not have the same elements as heat of passion manslaughter. Compare *Mendoza*, 468 Mich at 535, and *People v Riddle*, 467 Mich 116, 127; 649 NW2d 30 (2002).

it reversed the district court's bindover determination. *Id*. at 656-657. This Court impliedly agreed that bindover on manslaughter was warranted, but it did not directly analyze the issue of passion caused by provocation and whether the provocation was legally adequate because those issues were not before it. The facts in *Neal* show that, when a black man is chased by a white mob yelling racial epithets after the mob attacked the defendant's companion, the defendant can be found to have acted under provocation sufficient to excite passion beyond the control of reason. That is not the case here.

In this case, Sanchez did not make an unprovoked and sudden attack on Joesel. Joesel vandalized her boyfriend's car, and Sanchez confronted Joesel. Thus, Joesel was the initial provocateur. Although Sanchez pursued Joesel, she was not armed, and she was shorter and much lighter than Joesel. Simply put, Sanchez's push in the back, under all the surrounding circumstances, could not reasonably be considered adequate provocation for Joesel's act of plunging a hunting knife through Sanchez's rib cage, piercing her heart, removing the knife, and then plunging it deep into her thigh and piercing her femoral artery such that she bled to death at the scene. No reasonable juror could have concluded either that Sanchez aroused Joesel's passions, which were on full display long before the fatal attack, or that her actions were sufficient to arouse such violent passion in Joesel. Joesel was the aggressor in every instance, and he alone escalated matters. He acted with apparent deliberation throughout the incident that resulted in Sanchez's murder.

Even if the trial court erred when it concluded that the facts did not warrant a manslaughter instruction, we conclude that the error was harmless. See *Cornell*, 466 Mich at 361-362 (stating that the failure to give an instruction on a lesser included offense can be harmless error). In her closing argument, defense counsel attacked the evidence that Joesel acted with malice; she stated, in relevant part, that the only thing that made the situation dangerous was Sanchez's decision to attack Joesel. She then noted what could not be second-degree murder: a killing on sudden impulse and without reflection. She even quoted the jury instruction to that effect. She elaborated:

> And in other words, second-degree murder cannot be a heat-of-passion killing. And just like first-degree murder, one, it can't be one that's done by sudden impulse.

> And here we have a killing that is an impulsive reaction to being chased down and assaulted, and—and it's not murder.

> So putting these two things together, it's not murder if the killing is a result of a sudden impulse without reflection, and it's not murder if the killing was done under circumstances that reduce it to a lesser crime such as manslaughter, which is this heat-of-passion killing.

Defense counsel again informed the jury that Joesel's acts might be "something, but it's not murder," and all the jury had before it was the charge of "murder." She reiterated her belief that the evidence showed only that he acted on sudden impulse or acted out of passion or anger, which would be manslaughter and which was not available to the jury. She then argued that the jury could not find the malice required for murder on the evidence before it:

When you look at these facts and analyze the law in these instructions that the Judge is going to give you, can you say that this was anything other than what I told you three days ago—an impulsive reaction to being chased down and assaulted.

Can you say that it wasn't that?

Can you even say: Geez, I don't know if it was that. I don't think so.

He is not guilty of murder. He might be guilty of something, but it's not murder, and murder is what you have in front of him—in front of you.

The trial court also instructed the jury that it could not find Joesel guilty of murder consistent with the third element of second-degree murder if it found that Joesel killed Sanchez under circumstances that reduced the killing to a lesser crime: "Third, that the—that the killing was not justified, excused, or done under circumstances that reduced it to a lesser crime such as manslaughter, which occurs if the Defendant acted out of passion or anger brought about by adequate cause and before the Defendant had a reasonable time to calm down."

Defense counsel's argument and the trial court's instruction placed before the jury the question whether Joesel acted out of passion caused by adequate provocation; and it is evident that the jury rejected Joesel's claim that he acted out of passion after having been provoked by Sanchez. The absence of the manslaughter instruction was harmless because the jury rejected the defense theory that the killing was something less than second degree murder. Moreover, the failure to give an instruction on a lesser included offense will only warrant relief when the evidence clearly supported the lesser included instruction. See *id*. at 365. Given the overwhelming evidence that Joesel acted with calm deliberation before, during, and after the stabbing, any error in failing to instruct the jury that it could find Joesel guilty of manslaughter was harmless—indeed, harmless beyond a reasonable doubt. Therefore, any potential error does not warrant a new trial. See *id*. at 366-367.

## III.  TOXICOLOGY REPORT

### A.  STANDARD OF REVIEW

Joesel next argues that the trial court abused its discretion when it precluded him from presenting evidence that Sanchez's autopsy revealed that she had alcohol and cocaine in her system.

This Court reviews a trial court's evidentiary decisions for an abuse of discretion. *People v Roper*, 286 Mich App 77, 90; 777 NW2d 483 (2009). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *People v Daniels*, 311 Mich App 257, 265; 874 NW2d 732 (2015).  This Court reviews de novo the application of rules and statutes governing the admission of evidence. *Roper*, 286 Mich App at 91.  A trial court necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law. *Id*.

B. ANALYSIS

Relevant evidence is generally admissible. MRE 402.[4] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Even when evidence is relevant, the trial court may exclude the evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." MRE 403.

In the trial court, Joesel argued that evidence that Sanchez had consumed alcohol and used cocaine would be relevant because those substances can cause some people to become aggressive and violent. He maintained that this evidence would support his claim of self-defense because it would explain why he feared Sanchez. Defense counsel also raised the issue of character—she argued that Sanchez's use of those substances went to whether she had a character for peacefulness. She concluded that, "if the decedent's behavior is affected in such a way that it would be obvious to the defendant that the person was not acting normally, then it is relevant."

The trial court rejected the defense's arguments. It explained that the evidence would not be relevant unless Joesel knew that Sanchez was "high and drunk." The court also disagreed that Joesel had the right to present the evidence to prove Sanchez's character. The court reasoned that there was no evidence that Sanchez's alcohol and drug use was reflective of her character, particularly of a penchant for violence, and there was no evidence that Joesel knew Sanchez and knew that "every time she gets high or drunk she's—she's violent." For these reasons, it excluded the evidence of Sanchez's toxicology report.[5]

Our Supreme Court addressed when evidence of a victim's intoxication might be relevant in *People v Feezel*, 486 Mich 184; 783 NW2d 67 (2010). In that case, the defendant was charged with various crimes after he drove a vehicle while intoxicated and struck and killed a pedestrian. *Id*. at 187-188. The Supreme Court first held that the offenses at issue all contained an element of causation. *Id*. at 193. Because they all involved causation, the defense could present evidence that the victim was grossly negligent, which would sever the causal chain. See *id*. at 193-196. The Court determined that evidence that the victim was intoxicated was relevant and admissible because the fact of intoxication made it more likely that the victim acted with gross negligence. *Id*. at 198. Nevertheless, the Court cautioned that evidence of a victim's intoxication—even in the context of a crime involving proximate causation—would not always be admissible:

---

[4] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). This opinion relies on the version of the rules in effect at the time of trial.

[5] Joesel's claim that the trial court applied the wrong standard is not supported by the record. A careful reading of the trial court's analysis shows that the court applied a relevance standard and cited *People v Feezel*, 486 Mich 184; 783 NW2d 67 (2010). The court only discussed character evidence because the defense raised that as an alternate ground for allowing the admission of the evidence.

Generally, the mere fact that a victim was intoxicated at the time a defendant committed a crime is not sufficient to render evidence of the victim's intoxication admissible. While intoxication may explain why a person acted in a particular manner, being intoxicated, by itself, is not conduct amounting to gross negligence. In this case, however, the victim's extreme intoxication was highly probative of the issue of gross negligence, and therefore causation, because the victim's intoxication would have affected his ability to perceive the risks posed by his conduct and diminished his capacity to react to the world around him. Indeed, in this case, the proffered superseding cause was the victim's presence in the middle of the road with his back to traffic at night during a rain storm with a sidewalk nearby. Thus, the proofs were sufficient to create a jury-submissible question about whether the victim was grossly negligent, and the victim's high level of intoxication would have aided the jury in determining whether the victim acted with wantonness and a disregard of the consequences which may ensue. [*Id*. at 199 (quotation marks, citation, and alteration omitted).]

This case did not involve a superseding cause that might have relieved Joesel of liability for causing Sanchez's death. Joesel's defense was that he acted in self-defense. Self-defense is a subjective standard that looks to the circumstances as they appeared to the defendant. See *Riddle*, 467 Mich at 126-127. For that reason, Joesel's ability to assert the defense depended on evidence about his knowledge and perception of Sanchez, and her conduct and whether her conduct caused him to have a reasonable belief that his life was in danger or that he was in danger of serious bodily harm. *Id*. Even when character evidence is admissible to prove whether a victim was the initial aggressor, it is not admissible to prove that the defendant acted in self-defense: "However, unlike evidence tending to show that the victim was the aggressor, the decedent's violent reputation must be known to the defendant if he is to use it to show that he acted in self-defense." *People v Harris*, 458 Mich 310, 316; 583 NW2d 680 (1998).

There was no evidence that Joesel knew Sanchez personally before the incident at issue and no evidence that he had personal knowledge of her conduct while intoxicated or under the influence of cocaine. There was also no evidence that he knew that she used cocaine on the night at issue, or even that he knew she was drunk. He could not, therefore, argue that he feared her because he was aware that she was violent and dangerous while drunk or high. See *id*.

Joesel maintains that an expert could have testified that persons who are drunk and high are generally more aggressive and violent. Be that as it may, such evidence would not show that Sanchez was in fact subjectively more dangerous or violent on that night, and it would not establish that her observable behaviors were more dangerous or violent. To the extent that such expert testimony may have been relevant, it was relevant to explain why Sanchez did not take steps to avoid the obvious danger that Joesel posed to her. Expert testimony would not, however, shed any light on Joesel's *perception* of Sanchez's behaviors. Contrary to Joesel's suggestion, evidence about how Sanchez's intoxication might have affected her behaviors would not have permitted any inferences about how Joesel perceived those behaviors absent personal knowledge of those characteristics.

The evidence was also excludable because it was unfairly prejudicial. See MRE 403. All relevant evidence is inherently prejudicial, and, for that reason, it is not proper to exclude evidence under MRE 403 simply because it is damaging. See *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995). Nevertheless, when there is a possibility that the jury will weigh marginally probative evidence substantially out of proportion to its logically damaging effect, a trial court may properly exclude the evidence under MRE 403. See *id*. at 75-76.

In this case, the specific information provided by the toxicology report—to the extent that it was relevant at all—would have permitted inferences that explained why it was that Sanchez endangered herself by confronting a man who was stronger, taller, armed, and who clearly demonstrated his tendency for violence earlier in the night. It was not relevant to establish Joesel's knowledge or his perception of Sanchez's conduct. In theory, it might also have been admissible to show that Sanchez was the initial aggressor had that been an issue at trial. Whatever minimal relevance the evidence might have had, there was a substantial danger that the jury would have given the toxicology report weight out of proportion to its relevance. Joesel was in effect inviting the jury to conclude that Sanchez was at fault for her own death because she was drunk and high, and chose to attack a man who clearly posed a danger to her under the circumstances. Stated another way, it was evident that the toxicology report involved a "matter of scant or cumulative probative force" that the defense hoped to drag in "by its heels for the sake of its prejudicial effect." *Id*. at 75 (quotation marks and citation omitted). For that reason, the evidence was also inadmissible under MRE 403.

The trial court's decision to exclude Sanchez's toxicology report did not fall outside the range of principled outcomes. See *Daniels*, 311 Mich App at 264-265.

## IV. OV 19

### A. STANDARD OF REVIEW

Joesel next argues that the trial court clearly erred when it found that he interfered with the administration of justice and assigned 10 points under OV 19.

"This Court reviews for clear error a trial court's findings in support of [a] particular score under the sentencing guidelines but reviews de novo whether the trial court properly interpreted and applied the sentencing guidelines to the findings." *McFarlane*, 325 Mich App at 531-532. "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v Brooks*, 304 Mich App 318, 319-320; 848 NW2d 161 (2014) (quotation marks and citation omitted).

### B. ANALYSIS

Although the sentencing guidelines are now advisory, trial courts must still properly score the guidelines and must consider them when sentencing a defendant. *People v Lockridge*, 498 Mich 358, 391, 392 n 28; 870 NW2d 502 (2015). "When calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a [presentence investigation report or] PSIR, plea admissions, and testimony presented at a preliminary examination." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015). Further, the trial court may properly

-12-

rely on inferences that arise from the record evidence when making the findings underlying its scoring of OVs. *Id.* at 109.

Trial courts are to assign points under OV 19 on the basis of conduct that interferes with the administration of justice. See MCL 777.49. In relevant part, the trial court was to assign 15 points if it found that Joesel "used force or the threat of force against another person or the property of another person to interfere with, attempt to interfere with, or that results in the interference with the administration of justice." MCL 777.49(b). If it found that Joesel "otherwise interfered with or attempted to interfere with the administration of justice," it was to assign 10 points under OV 19. MCL 777.49(c). A person interferes with the administration of justice if he or she does anything to "hamper, hinder, or obstruct the act or process of administering judgment of individuals or causes by judicial process." *People v Hershey*, 303 Mich App 330, 342-343; 844 NW2d 127 (2013).

At sentencing, the trial court relied on the testimonies of the officers at trial when finding that Joesel interfered with the administration of justice in the moments before and during his arrest. Detective Kyle Hall testified that he and other officers tried to contact Joesel as they awaited a search warrant and knocked at both doors and announced their presence, but Joesel did not answer. He stated that Joesel finally opened the door slightly at about 8:15 a.m. They tried to get Joesel out of the apartment because they could not see both of his hands, but he tried to shut the door on them. Detective Hall stated that he "pushed the door open" and took Joesel into custody. Although Detective Hall did not agree that it was "quite a tussle," he admitted that he "dragged" Joesel out of the apartment to arrest him. Detective Hall explained that Joesel had not been "compliant." Detective Hall stated that he had obtained a warrant for Joesel's arrest by the time of that encounter.

Detective Hall's testimony that Joesel had not been compliant permitted an inference that he ordered Joesel to show his hands and come out of the apartment. The evidence that Joesel tried to close the door on the officers and that Detective Hall had to force the door open to take Joesel into custody under the authority of an arrest warrant permitted an inference that Joesel was disregarding a lawful command, which can constitute interference with the administration of justice. See *id.* at 344 (observing that disobeying a police order can constitute interference with the administration of justice). Given this evidence, the trial court did not clearly err when it found that Joesel interfered with the administration of justice. See *Brooks*, 304 Mich App at 319-320. The trial court, accordingly, did not err when it assigned 10 points under OV 19. See MCL 777.49(c).

## V. PROPORTIONATE SENTENCE

### A. STANDARD OF REVIEW

We next address Joesel's argument that the trial court's decision to sentence him to a minimum of 33 years in prison was disproportionate to him as an offender and the nature of his offense.

This Court reviews a trial court's decision that a particular sentence is proportionate to the offender and the offense for an abuse of discretion. *People v Lydic*, 335 Mich App 486, 500; 967

NW2d 847 (2021). A trial court abuses its discretion when it selects a sentence that is not proportionate to the offender and offense. *Id.*

## B. ANALYSIS

The Legislature has granted to trial courts the discretion to sentence a defendant—with some exceptions—within a given range. See *People v Posey*, 512 Mich 317, 343; 1 NW3d 101 (2023) (opinion by BOLDEN, J.); see also *People v Purdle*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 353821); slip op at 3-4 (stating that, although the lead opinion in *Posey* was not technically binding, this Court will follow it in the interests of judicial economy). When exercising its discretion to select a sentence within that range, a trial court must individualize the sentence to the circumstances surrounding the offense and the offender. *Posey*, 512 Mich at 343. See also *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010). Michigan courts utilize the now advisory sentencing guidelines to help individualize the sentences while reducing disparities premised on improper factors. *Posey*, 512 Mich at 343-344. When reviewing a sentence, this Court applies the proportionality test stated in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), without regard to whether the trial court's sentence falls within the recommended range of the sentencing guidelines. See *Posey*, 512 Mich at 351-353.

This Court has held that the sentencing guidelines are a useful tool for courts to review the proportionality of a sentence, and has stated that trial courts must justify the sentence actually imposed:

> Because the guidelines embody the principle of proportionality and trial courts must consult them when sentencing, it follows that they continue to serve as a "useful tool" or "guideposts" for effectively combating disparity in sentencing. Therefore, relevant factors for determining whether a departure sentence is more proportionate than a sentence within the guidelines range continue to include (1) whether the guidelines accurately reflect the seriousness of the crime; (2) factors not considered by the guidelines; and (3) factors considered by the guidelines but given inadequate weight. When making this determination and sentencing a defendant, a trial court must justify the sentence imposed in order to facilitate appellate review, which includes an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been. [*People v Dixon-Bey*, 321 Mich App 490, 524-525; 909 NW2d 458 (2017) (quotation marks and citations omitted).]

At sentencing, the trial court acknowledged that the recommended range for Joesel's minimum sentence was 13$\frac{1}{2}$ years to 22$\frac{1}{2}$ years, but it nevertheless chose to sentence him to serve a minimum of 33 years in prison. The trial court noted that Sanchez was relatively young when Joesel ended her life, but it did not state whether that justified a longer sentence. It did state that it felt that Joesel's failure to take responsibility was a factor not considered under the guidelines, which can be an important factor to consider. See *People v Lemons*, 454 Mich 234, 259-260; 562 NW2d 447 (1997) (holding that the sentences were proportionate because, in relevant part, the defendant "expressed no remorse whatsoever"). The court did not, however, include an explanation establishing how the sentence it actually imposed was more proportionate to Joesel's

offense and status as an offender than a different sentence, particularly a sentence within the applicable sentencing guidelines range, would have been. See *Dixon-Bey*, 321 Mich App at 525. The facts of this case would likely justify a more severe minimum sentence than identified under the sentencing guidelines, but on this record, the trial court did not provide sufficient justification for the sentence imposed. Accordingly, we vacate Joesel's sentence and remand for resentencing.

## VI. RESTITUTION

### A. STANDARD OF REVIEW

Finally, Joesel argues that the trial court did not have the authority to order him to pay restitution for Sanchez's lost income. He also maintains that there was insufficient evidence to support the amount of income loss and the Sanchez family's future counseling expenses.

"Whether and to what extent a loss must be compensated is a matter of statutory interpretation; and this Court reviews de novo the proper interpretation of statutes." *People v Allen*, 295 Mich App 277, 281; 813 NW2d 806 (2011). This Court reviews a trial court's findings in support of an order of restitution for clear error. *Id*.

### B. BACKGROUND LAW

The victims of crime have a constitutional and statutory right to restitution. *People v Bentley*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 364303); slip op at 3. They have a right under the general restitution statute, see MCL 769.1a, and under the Crime Victim's Rights Act (CVRA), see MCL 780.751 *et seq*. *Bentley*, ___ Mich App at ___; slip op at 3. The primary difference between the general restitution statute and the CVRA is that the general restitution statute does not provide compensation for future losses. See *id*.; slip op at 4 n 4. Both statutes, however, mandate the order of full restitution, which means restitution that is maximal and complete. *Id*.; slip op at 4. Nevertheless, the restitution must bear a direct causal relationship to the conduct underlying the offense of conviction, and the restitution may encompass only losses that are easily ascertained and are a direct result of the defendant's criminal conduct. *Id*. When there is a dispute about the amount of compensation, the prosecution bears the burden to prove the amount of the loss by a preponderance of the evidence. *Id*. Notably, because the CVRA mandates full restitution for the victims of crime, the enumerated list of injuries for which restitution must be ordered is not exclusive; rather, those provisions tell courts how to evaluate specific types of losses. See *People v Garrison*, 495 Mich 362, 368-369; 852 NW2d 45 (2014).

Under the CVRA, a trial court must order a person convicted of a crime to pay full restitution to his or her victims: "when sentencing a defendant convicted of a crime, the court shall order, in addition to or in lieu of any other penalty authorized by law or in addition to any other penalty required by law, that the defendant make full restitution to any victim of the defendant's course of conduct that gives rise to the conviction or to the victim's estate." MCL 780.766(2). This provision is broadly worded and requires restitution for all losses incurred by a victim as a result of the course of conduct that gave rise to the defendant's conviction. See *Garrison*, 495 Mich at 368 (observing that the CVRA imposes a "duty on sentencing courts to order defendants to pay restitution that is maximal and complete").

-15-

## C. FUTURE INCOME

In the present case, the jury found that Joesel murdered Sanchez. Accordingly, it was beyond reasonable dispute that Joesel's course of conduct directly caused Sanchez to be unable to earn income from the moment of her death. MCL 780.766(4)(c) provides that, "[i]f a crime results in physical . . . injury to a victim, the order of restitution shall require that the defendant . . . [r]eimburse the victim or the victim's estate for after-tax income loss suffered by the victim as a result of the crime." For that reason, the trial court was obligated to order Joesel to reimburse Sanchez's estate for Sanchez's after-tax income losses and, on the basis of the evidence, the court found that Sanchez would have earned $1,539,574.40 after taxes during the remainder of her life. The trial court then ordered Joesel to pay restitution of that amount.

On appeal, Joesel argues that this provision does not authorize a trial court to order reimbursement for lost income for a deceased victim. Specifically, he cites the Legislature's use of the term "suffered" in MCL 780.766(4)(c) as evidence that the Legislature did not intend to allow reimbursement for future income losses.

Joesel reads the term "suffered" in isolation and places much weight on the Legislature's use of the past tense. The Legislature addressed the victim's "after-tax income loss" in MCL 780.766(4)(c) and provided that that loss must be "suffered by the victim as a result of the crime." The phrase introduced by the term "suffered" qualifies the nature of the loss for which reimbursement must be ordered. Stated another way, the Legislature intended to limit the after-tax losses for which compensation must be paid to those losses the prosecution can show were suffered as a direct result of the actual crime of which the defendant was convicted. The Legislature's use of the past tense form of the verb "to suffer" does not demonstrate that the Legislature intended to impose a strict temporal limitation on the order of reimbursement for all income losses. An injured victim who can show that his or her injury will prevent him or her from working for a specified period of time has "suffered" an identifiable income loss even before the passage of time within which he or she would have earned the income. This Court has already acknowledged that a victim might be able to establish that he suffered an income loss within the meaning of MCL 780.766(4)(c) with proof that the victim would be unable to work for a specified period. See *People v Corbin*, 312 Mich App 352, 371; 880 NW2d 2 (2015). Sanchez's death plainly precluded her from being able to earn income for the remainder of her expected lifespan.

Joesel's preferred interpretation would also create practical difficulties for victims and trial courts. A victim would almost never suffer lost income at the very moment that he or she suffered a physical injury consistent with MCL 780.766(4). Rather, a victim's injury would typically preclude the victim from earning income—other than passive income—at some future point after suffering the injury. Under Joesel's preferred interpretation, a person who was incapacitated—but not killed—would only be entitled to reimbursement for lost income up to the moment of the restitution hearing or request for restitution because those income losses would be the only losses actually "suffered"—in a temporal sense—by the victim to that point. That would be true even though the victim's incapacity might be permanent. Presumably, in those situations, the victim—or the victim's estate—would have to periodically return to the trial court to request additional reimbursement for the newly suffered income losses as those losses occurred, as permitted by MCL 780.766(22) ("The court may amend an order of restitution entered under this section on a motion by the prosecuting attorney, the victim, or the defendant based upon new information

related to the injury, damages, or loss for which the restitution was ordered.").  The conclusion that the Legislature intended to require reimbursement for income loss when there is evidence that the victim's injury is such that he or she will continue to be unable to earn income is consistent with the remedial nature of the statute and the Legislature's goal of shifting the burden of losses from victims to the perpetrators of crimes.  See *Allen*, 295 Mich App at 282.

In any event, even if MCL 780.766(4)(c) only applies to after-tax income losses that the victim has suffered as of the request for restitution or restitution hearing, that provision would not preclude trial courts from ordering reimbursement for future income losses consistent with the other provisions of the CVRA.  The provisions for restitution stated under MCL 780.766(4) are "complementary to the broad mandate for complete restitution" stated under MCL 780.766(2), and do not constitute an "exhaustive list of all types of restitution available under Michigan law for victims . . . ."  *Garrison*, 495 Mich at 369-370.  A person who is unable to work as a result of the commission of a crime is a victim who "suffers direct . . . financial . . . harm," MCL 780.766(1), and who is entitled to "full restitution," MCL 780.766(2).  Thus, future losses are not precluded under MCL 780.766(4)(c) and are clearly encompassed within the broad mandate of MCL 780.766(2).

Joesel also invokes other grounds for concluding that the order of restitution was improper.  He maintains that, to the extent that the CVRA is ambiguous, this Court must apply the rule of lenity to mitigate the punishment imposed by the order of restitution.  An order of restitution is not a penalty, however.  See *People v Foster*, 319 Mich App 365, 389; 901 NW2d 127 (2017).  Accordingly, the rule of lenity does not apply to it.  See *People v Johnson*, 302 Mich App 450, 462; 838 NW2d 889 (2013).

He also argues that the trial court's order of restitution infringed his right to have a jury trial in a civil case decide whether and to what extent he should be liable for the damages caused by his conduct.  The statutory scheme for restitution is separate and independent of the remedies available in a civil proceeding.  *People v Lee*, 314 Mich App 266, 275; 886 NW2d 185 (2016).  Indeed, the Legislature specifically contemplated that a victim might obtain compensation in a civil proceeding in addition to compensation through restitution and provided that any amounts received in restitution would be set off against the amount later recovered in a civil proceeding.  MCL 780.766(9).  Consequently, these additional grounds do not establish that the CVRA did not authorize the trial court to order restitution for future income losses.  The trial court did not err when it determined that future income losses were subject to restitution under the CVRA.

Joesel also argues that the prosecution presented insufficient evidence to establish Sanchez's potential future earnings.  More specifically, he maintains that the prosecution had to present evidence establishing Sanchez's employment history and the amount that she had actually made.  Joesel's arguments are not well-taken.

As this Court has explained, although the restitution must be for actual losses suffered by the victims, the method for calculating the losses is a matter of reasonableness:

> Put simply, the amount of restitution must be based on the *actual* loss suffered by the victim.  The standard for calculating a restitution award under the CVRA is simply one of reasonableness.  The language of the statute does not

suggest the need for absolute precision, mathematical certainty, or a crystal ball. But speculative or conjectural losses are not deemed reasonably expected to be incurred under the CVRA. Therefore, where the evidence provides a reasonably certain factual foundation for a restitution amount, the statutory standard is met.

To that end, when determining the amount of restitution to award a victim, the focus is consistently not on what a defendant took, but what a victim lost because of the defendant's criminal activity. Moreover, restitution is not designed to provide a windfall for crime victims, but was created to ensure that victims are made whole for their losses to the extent possible. [*Bentley*, ___ Mich App at ___; slip op at 4-5 (quotation marks, citations, and alterations omitted).]

There was testimony at trial that Sanchez was employed as a medical assistant, and the prosecution informed the trial court that Sanchez had been employed as a resource technician with Michigan State University's College of Human Medicine. Even though Sanchez had been employed in a professional capacity with education beyond the high school level, the prosecution relied on evidence that established the median weekly earnings for a woman of Sanchez's age with only a high school education. The prosecution then used that data and applied it to Sanchez's expected remaining lifespan, as determined using the Unites States Social Security Administration's life expectancy calculator to determine how much she was likely to earn over her remaining lifespan. The prosecution then adjusted that figure by deducting taxes. The result was $1.539 million.

The prosecution presented evidence from which the trial court could infer that Sanchez had gainful employment earning an income at a level beyond that which a woman of her age would typically have earned with a high school diploma. Despite that, the prosecution only asked for an order of restitution for an amount that a woman with a high school diploma could be expected to make. As such, her expected income was actually understated.

The prosecution also used a mortality calculator to determine Sanchez's expected remaining lifespan. Courts have recognized mortality tables as competent evidence for decades. See, e.g., *Jenkins v Canfield*, 282 Mich 277, 279; 276 NW 447 (1937). Moreover, there was no evidence in the record that showed that Sanchez had a health concern that would alter her life expectancy.

Although "an element of uncertainty always lurks in the background when a fact-finder predicts future damages," *Corbin*, 312 Mich App at 368, the evidence presented by the prosecution provided "a reasonably certain factual foundation" for the restitution actually found, *Bentley*, ___ Mich App at ___; slip op at 4-5. On this record, there was sufficient evidence to support the trial court's finding that Sanchez would have earned $1,539,574.40 over her expected remaining years. Accordingly, we are not left with the definite and firm conviction that the trial court's finding was clearly erroneous. See *Allen*, 295 Mich App at 281. Joesel has not shown that the trial court erred when it ordered him to pay $1,539,574.40 in restitution for Sanchez's lost income.

## D.  PSYCHOLOGICAL TREATMENT

The parties suggest that the trial court had the discretion to select an amount of restitution related to psychological treatment, but the law does not support that view.  The trial court had to order full restitution—no more, no less.  See MCL 780.766(2); *Allen*, 295 Mich App at 281 n 1 (relating that it was "inaccurate to state that trial courts have the discretion to award restitution" because the statute does not confer such discretion and it would necessarily amount to an abuse of discretion to order restitution other than full restitution).  The sole question was whether the trial court clearly erred when it found that the prosecution established that Sanchez's immediate family had incurred and would reasonably be expected to incur, see MCL 780.766(4)(d), more than $83,000 in psychological treatment.

In this case, the prosecution requested restitution for counseling services for Sanchez's parents and four siblings in the amount of $87,360.  It derived that rate on the assumption that all six members of her family would need five years of counseling with 26 sessions a year at a rate of $112 an hour.  The prosecution did not present any evidence to support that request.  At the restitution hearing, the prosecution offered to present evidence that Sanchez's immediate family members had in fact been going to counseling and had had unreimbursed expenses, but the trial court did not agree to take testimony.

The trial court had to order Joesel to pay "an amount equal to the reasonably determined cost of psychological and medical treatment for members of the victim's family actually incurred and reasonably expected to be incurred as a result of the crime."  MCL 780.766(4)(d).  The trial court found that Sanchez's immediate family members had incurred or would reasonably be expected to incur a total of $83,906.02 in counseling services without any evidence in the record to support that amount.  There was no evidence that they reasonably expected to incur additional psychological expenses and no evidence concerning the expected length of treatment, the causal link between the treatment and the crime, or the reasonable costs of the treatment. Cf. *Corbin*, 312 Mich app at 368-370.  In the absence of such evidence, the trial court clearly erred when it found that Sanchez's family had incurred and would incur a total of $83,906.02 in counseling expenses. See *Allen*, 295 Mich App at 281.  Nevertheless, the parties agree on appeal that the prosecution presented receipts after the restitution hearing that established that Sanchez's family members had in fact incurred counseling expenses and that the trial court did not clearly err when it included that amount in the restitution order.  Consequently, we vacate the trial court's order of restitution, but only to the extent that it included an order to pay $83,906.02 in future counseling services.[6]

## VII.  CONCLUSION

In Docket No. 362388, we affirm Joesel's conviction, but remand for resentencing consistent with this opinion.  In Docket No. 367180, we vacate the trial court's order of restitution to the extent that it included $83,906.02 in future counseling services.  In all other respects, we affirm the order of restitution.

---

[6] Nothing prevents the prosecution or Sanchez's immediate family members from seeking additional restitution under MCL 780.766(22) on remand.

Affirmed in part, vacated in part, and remanded for resentencing.  We do not retain jurisdiction.


/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly